IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 9, 2007

**Charles R. Fulbruge III**
**Clerk**

))))))))))))))))))))))))))))

No. 05-70046

))))))))))))))))))))))))))))

JONATHAN BRUCE REED,

              Petitioner-Appellant,

     v.

NATHANIEL QUARTERMAN, Director, Texas Department of Criminal
     Justice, Correctional Institutions Division,

              Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Texas
No. 3:99-CV-0207-N

_____

Before HIGGINBOTHAM, DAVIS and PRADO, Circuit Judges.

PRADO, Circuit Judge:

     Petitioner-Appellant Jonathan Bruce Reed ("Reed") was

convicted and sentenced to death in 1983 for the murder of Wanda

Wadle ("Wadle"). Reed comes before us to request a Certificate of

Appealability ("COA") on eight issues for which he was denied a

COA by the district court after the court rejected Reed's

petition for habeas corpus relief. Reed also appeals the district

court's denial of habeas relief on the one claim for which the

district court granted him a COA: his Batson claim alleging that

the prosecution violated his rights under the Sixth and

1

Fourteenth Amendments through the racially discriminatory use of its peremptory challenges. See Batson v. Kentucky, 476 U.S. 79 (1986).

## I. FACTUAL AND PROCEDURAL BACKGROUND

Around 12:40 p.m. on November 1, 1978, Kimberly Pursley ("Pursley"), Wadle's roommate, returned to their shared apartment. As Pursley entered the apartment, she heard a man's voice from Wadle's bedroom say "don't come in here" and "stay out there." Pursley remained in the living room. After a few moments, a man stepped out of the bedroom and snapped closed a knife sheath. The man stated that he was from maintenance and was there to check the air filter, and he pointed toward the ceiling. Pursley looked toward the ceiling and then noticed her roommate's nude body on the floor of the bedroom. The man then threw Pursley to the floor and bound and gagged her. He asked if she had any money, and Pursley nodded yes. The man began to search Pursley and Wadle's purses, which were located on the living room sofa. He made several circuits of the apartment during which he drank water from a glass in the kitchen and looked through the bedroom and living room areas. He then attempted to strangle Pursley, straddling her with his legs and grabbing her throat. Pursley feigned unconsciousness. The man released her throat and left the apartment.

Pursley managed to free herself from her bindings and went to check Wadle, whom she found with blood oozing from her mouth,

2

her gaze fixed, and her hands tied with a telephone cord. Around Wadle's head were a plastic bag and belt pulled taut. Pursley went outside her apartment to call for help. A neighbor, Rosemary Asencio ("Asencio"), appeared and let Pursley into her apartment to call the police while she went to investigate Wadle's condition. Asencio found Wadle lying naked on her back with her legs spread apart and her head and shoulders under the bed. Asencio managed to remove the plastic bag and belt from Wadle's neck and began CPR. Emergency medical technicians arrived and took Wadle to the hospital, where she died nine days later without ever regaining consciousness.

Pursley identified Reed as her assailant in a corporeal lineup. At the same lineup, two other residents of Pursley and Wadle's apartment complex identified Reed as a person they had seen in the complex shortly before the time of the murder. These residents, Mikki Flanagan ("Flanagan") and Phil Hardin ("Hardin"), as well as Pursley, subsequently testified at Reed's trial.[1]  Flanagan testified that Reed came to her door shortly

---

[1] Reed contends that these witnesses' identifications are unreliable because the witnesses met with police to review a small number of photographs before picking Reed out of the lineup. Reed also argues that the witnesses collaborated in forming a description of the perpetrator. He notes that Flanagan was present while Pursley met with the composite artist to record her recollection. Reed states that Pursley initially identified her assailant as wearing a white or light blue shirt, and then later testified that the shirt was red. Reed also notes that Flanagan and Hardin spoke together about their observations and jointly viewed the lineup containing Reed.

after noon on November 1, 1978, claiming that he was there to check air conditioning filters. Hardin testified that he saw Reed in the complex around noon on November 1, 1978, wearing a red shirt and blue jeans. Pursley and Flanagan also testified that Reed had worn a red shirt and blue jeans. A fourth eyewitness was Ken Ezelle ("Ezelle"), a maintenance worker for the apartment complex who testified that he saw a man with a red shirt and blue jeans running away from the area of Wadle and Pursley's apartment, where a woman could be heard screaming.[2] In his defense, Reed presented testimony from his employer and family members to establish that he could not have been in the vicinity of Wadle's apartment at 12:40 p.m. and that he was not wearing a red shirt and blue jeans on the day in question. Reed also relied on the absence of physical evidence connecting him to the crime.

In March 1979, Reed was convicted and sentenced to death for murdering Wadle in the course of committing robbery and aggravated rape. The trial court granted Reed's motion for a new trial, and Reed was tried again in 1983. At this second trial, in addition to the aforementioned eyewitnesses, the state produced as a rebuttal witness William McLean, Jr. ("McLean"), a cellmate of Reed in Texas prison who testified that Reed had confessed to him that he had murdered Wadle. In March 1983, Reed was again convicted of capital murder and sentenced to death. The Texas Court of Criminal Appeals affirmed Reed's conviction and

---

[2] Ezelle did not attend a lineup.

sentence, and the United States Supreme Court denied certiorari. Reed v. State, No. 69,292 (Tex. Crim. App. March 29, 1995) (unpublished), *cert. denied*, 516 U.S. 1050 (1996). Reed then pursued state post-conviction relief. His state application for a writ of habeas corpus was denied by the Court of Criminal Appeals in September 1998. Ex parte Reed, No. 38,174-01 (Tex. Crim. App. Sept. 16, 1998) (unpublished), *cert. denied*, 526 U.S. 1021 (1999).

Reed filed his petition for federal habeas relief in 1999. The magistrate judge assigned to the case recommended that relief be denied, and the district court adopted the magistrate's recommendation on February 19, 2003. Reed filed a Rule 59(e) motion to alter or amend the judgment. Reed subsequently filed a motion to disqualify the magistrate judge, alleging that the magistrate judge had discussed Reed's case with a witness. The magistrate judge recused himself, and another magistrate judge was assigned. Reed's Rule 59(e) motion was then denied. Reed filed his notice of appeal on May 1, 2003. Reed also moved for a transfer of his case to a different district judge, alleging that the district judge to whom his case had been assigned exhibited signs of diminished competency. In September 2003, this court vacated the district court's orders and remanded the case for reconsideration. Reed v. Dretke, No. 03-10432, 2003 U.S. App. LEXIS 27937 (5th Cir. Sept. 15, 2003). The district judge recused himself and a new district judge was assigned to the case. The

district court held an evidentiary hearing on Reed's prosecutorial misconduct claims on February 24, 2005. On July 26, 2005, the district court denied habeas relief on all of Reed's claims. The district court granted a COA on Reed's <u>Batson</u> claim, and denied a COA as to all other of Reed's claims.

## II. REED'S REQUESTS FOR A COA

**A.   Standards of Review**

Reed's federal habeas petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA); therefore, his petition is subject to AEDPA's requirements. <u>Lindh v. Murphy</u>, 521 U.S. 320, 336 (1997). Under AEDPA, a petitioner can appeal a district court's dismissal of a habeas petition only if the district court or this court issues a COA. 28 U.S.C. § 2253(c); <u>see also</u> <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335-36 (2003). Because the district court denied Reed's request for a COA as to eight of his claims, Reed must seek a COA from this court to obtain further review of those eight claims. <u>See</u> 28 U.S.C. § 2253(c); <u>see also</u> <u>Coleman v. Quarterman</u>, 456 F.3d 537, 541 (5th Cir. 2006).

We will issue a COA if Reed can make "a substantial showing of the denial of a constitutional right" by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000). At this stage, our inquiry "is a

threshold inquiry only, and does not require full consideration of the factual and legal bases of [the petititoner's] claim." Neville v. Dretke, 423 F.3d 474, 482 (5th Cir. 2005). Because Reed was sentenced to death, "we must resolve any doubts as to whether a COA should issue in his favor." Martinez v. Dretke, 404 F.3d 878, 884 (5th Cir. 2005).

In determining whether reasonable jurists would debate the district court's assessment of Reed's claims, we must keep in mind that the district court's decision must be made pursuant to AEDPA's deferential standards. Tennard v. Dretke, 542 U.S. 274, 282 (2004); Leal v. Dretke, 428 F.3d 543, 548 (5th Cir. 2005). AEDPA permits relief only on two bases. First, the petitioner is entitled to relief if the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d); Leal, 428 F.3d at 548. A decision is contrary to federal law if it is "opposite to that reached by [the Supreme] Court on a question of law" or if it resolves a case differently from the way the Supreme Court has on a set of materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 412-13 (2000). A decision unreasonably applies federal law when it "identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407. Additionally, a state court decision unreasonably applies federal law if it

7

"either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id.

Second, the petitioner is entitled to relief when the state court decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Leal, 428 F.3d at 548. We note that "[t]he state court's findings of fact are entitled to a presumption of correctness and the petitioner may overcome that presumption only by clear and convincing evidence." Leal, 428 F.3d at 548 (citing 28 U.S.C. § 2254(e)(1)).

**B.   Analysis**

Reed seeks a COA as to eight issues on which the district court denied habeas relief and denied a COA. We address each issue in turn.

### 1.   Discovery Regarding McLean

Reed first seeks a COA on his claim that the district court abused its discretion by denying his request for discovery of files regarding contact between the prosecution and the informant McLean.

A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of course. Bracy v. Gramly, 520 U.S. 899, 904 (1997). The habeas petitioner is entitled to discovery only where "good cause" is

8

shown. Id. The Supreme Court has held that good cause is shown where "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief." Harris v. Nelson, 394 U.S. 286, 300 (1969).

On November 30, 2004, the district court scheduled an evidentiary hearing, at Reed's request, on the subjects of the Dallas County district attorney's office's knowledge of McLean's alleged perjury and the existence of any agreement between McLean and the Dallas County district attorney's office.[3] McLean had recanted his testimony against Reed in an unsolicited sworn statement sent to the Dallas County district attorney's office in 1986. Before the hearing, Reed sought discovery of state files pertaining to McLean. Specifically, Reed sought discovery of files regarding McLean in the possession or control of the Dallas County district attorney's office, sheriff's office, and police department, and multiple named individuals who were employed by the Dallas County police department, sheriff's office, or district attorney. The government opposed this request. Reed also requested records pertaining to McLean from the Texas Board of Pardons and Paroles and the Texas Department of Criminal Justice, which the government did not oppose.

---

[3] The hearing, which was held on February 24, 2005, also addressed the existence of any fingerprint evidence.

In a December 23, 2004 order, the district court granted Reed's motion for discovery "to the extent the motion is unopposed" and denied it "[t]o the extent the motion is opposed." The district court explained that "[p]etitioner has already obtained significant information on the subjects requested, and the Court is of the view that further prehearing discovery is unnecessary for Petitioner adequately to present his case on the limited subject matter of the hearing."

In its July 26, 2005 opinion denying Reed's habeas petition, the district court went into greater length regarding Reed's claim that McLean testified in exchange for promises by the district attorney's office. The district court credited the testimony of the former district attorney, Knox Fitzpatrick ("Fitzpatrick"), that he had no agreement with McLean to give McLean favorable treatment in exchange for testimony against Reed and that he believed McLean's testimony to be truthful. The district court further found that McLean's testimony was "not credible and of little probative value." Regarding Reed's evidence of letters from McLean to Fitzpatrick asserting the existence of a deal between them, the court found that "McLean's assertion of a deal in his correspondence was not truthful and was an attempt to manipulate Fitzpatrick into assisting him." Regarding Fitzpatrick's subsequent efforts to assist McLean in obtaining a transfer to a different facility, the court concluded that "Fitzpatrick's intervention for McLean is equally consistent

10

with an assistant district attorney who was advised that a cooperating witness was in physical danger as a result of his cooperation."

The district court also addressed whether the district attorney's office knew that McLean's testimony was false. While the district court conceded that "Reed makes a persuasive case through expert medical testimony that the substance of McLean's testimony of Reed's confession was false," the court found that "[t]he medical evidence now suggesting that McLean's testimony was false was not available to Fitzpatrick or the District Attorney's office at the time of Reed's trial." As a result, the court found that "the record before it establishes clearly that Fitzpatrick and the District Attorney's office believed that McLean's testimony regarding Reed's confession was true."

Reed now argues that the district court abused its discretion by denying discovery of the state's files where such discovery was opposed by the state. Reed claims that his request "targeted information directly relevant" to his claims that McLean perjured himself with the knowledge of the government and in exchange for government promises. Reed proposes that the content of the communications could show "the existence of a bargain for McLean's testimony against [Reed] and how the substance of McLean's allegations against [Reed] were developed." Moreover, Reed argues that he has made a sufficient demonstration that McLean's testimony was perjurious, and that the district

11

attorney's office knew this fact, to satisfy the "good cause" requirement. Reed further contends that he has also presented sufficient evidence that the district attorney's office made promises to McLean in exchange for his testimony. Reed notes that by holding an evidentiary hearing on the subject of McLean's testimony, the district court implicitly found that Reed met a higher standard than is required for obtaining discovery.

The state responds that reasonable jurists would agree that the district court properly denied Reed's discovery request. The state contends that Fitzgerald "was subjected to a vigorous cross-examination by Reed at the evidentiary hearing," even in the absence of the documents sought. The state further argues that "Reed's contention that there might have been documents out there proving that [the] State knew that McLean's veracity was questionable is speculative, at best."

We agree with Reed that reasonable jurists could debate whether the district court abused its discretion by denying Reed's discovery request. See Hill v. Johnson, 210 F.3d 481, 487 (5th Cir. 2000). Reed has a strong argument that he has satisfied the "good cause" requirement necessary to obtain discovery--that is, that he has put forth "specific allegations" that "show reason to believe that [he] may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief." See Bracy, 520 U.S. at 908-

12

09.

Reed relies on Napue v. Illinois, 360 U.S. 264, 269 (1959), where the Supreme Court held that it is a violation of the Fifth and Fourteenth Amendments to the United States Constitution for the prosecution to knowingly use perjured testimony. This court has held that a conviction must be set aside where the petitioner has demonstrated that (1) the witness gave false testimony; (2) the falsity was material in that it would have affected the jury's verdict; and (3) the prosecution used the testimony knowing it was false. May v. Collins, 955 F.2d 299, 315 (5th Cir. 1992). False evidence is deemed material for this analysis "if there is any reasonable likelihood that [it] could have affected the jury's verdict." Westley v. Johnson, 83 F.3d 714, 726 (5th Cir. 1996). Since there is clearly a reasonable likelihood that McLean's statements that Reed had confessed to the Wadle murder could have affected the jury's verdict, there can be no doubt that McLean's testimony was material. Accordingly, if McLean lied on the witness stand regarding Reed's confession and the district attorney's office, and if the district attorney knew that McLean was lying, Reed should be entitled to habeas relief. Reed's allegations suggest that if the facts are fully developed, he may be able to demonstrate an entitlement to relief on this bases.

First, Reed has made and supported a specific allegation that the district attorney knew that McLean lied regarding Reed's

13

confession. As the district court acknowledged, Reed has produced medical evidence that suggests that the substance of McLean's testimony of Reed's confession was false. Specifically, McLean testified that Reed told him that Wadle was using a tampon at the time of the murder, which prevented Reed from completing a sexual assault. The report by the doctor who examined Wadle for rape within hours of her assault, however, made no mention of a tampon. The doctor has subsequently declared that he would certainly have noticed and made note of a tampon if one had been present during the examination. The report that did note the presence of a tampon was the autopsy report created following Wadle's death, nine days after her assault. Based on the autopsy report, Reed concludes that Wadle had only begun her menstrual period shortly before her death. Reed asserts that the autopsy report provides further evidence that Wadle would not have been wearing a tampon at the time of the assault.

The district court concluded that this evidence did not imply that the district attorney's office was aware that McLean's testimony was false. The district court stated that "[t]he medical evidence now suggesting that McLean's testimony was false was not available to Fitzpatrick or the District Attorney's office at the time of Reed's trial." This statement appears to be incorrect: the report by the doctor who examined Wadle for rape was almost certainly available to the district attorney at the

14

time of Reed's trial. Moreover, assuming McLean was lying, there is reason to wonder how he decided to introduce the tampon into his account. Reed raises a plausible theory: that the district attorney's office, erroneously relying on the autopsy report, coached McLean to mention the tampon to bolster its claim that Reed committed murder in the course of committing aggravated rape.

Reed has also made and supported a specific allegation that the district attorney had made promises to McLean in exchange for his testimony, and that therefore the district attorney knew that McLean was lying when he testified that no such promises had been made.[4] Reed cites letters from McLean to Fitzpatrick asserting the existence of a deal between them in relation to Reed's case. Reed also points to letters that Fitzpatrick wrote to the Texas Department of Corrections on McLean's behalf regarding a possible transfer. The district court correctly noted that McLean is not entirely credible, and that Fitzpatrick's acts are consistent with a desire to protect a cooperating witness. Still, reasonable jurists could debate whether Reed's evidence is sufficient to show good cause for further discovery. Moreover, Reed points to contact McLean had with the Dallas County police department in suspicious proximity to McLean's transfer to Reed's cell and to

---

[4] Here, Reed relies not only on <u>Napue</u> but on <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963), where the Supreme Court held that the prosecution has a duty to disclose exculpatory evidence.

the dramatic reduction in the amount of jailtime McLean was offered in exchange for his guilty plea (from thirty years to fifteen years).

Because reasonable jurists could debate whether the district court abused its discretion by denying Reed's discovery request for state files concerning McLean, we grant a COA to Reed on this issue.

### 2. Discovery of Information Concerning the Identity and Location of Physical Evidence

Reed also moved for the district court to compel the state to locate the remaining physical evidence in his case, identify the custodians who have control of it now, determine the chain of custody related to this evidence, and identify any items of physical evidence seized in connection with the Wadle murder that have been lost, destroyed, or are no longer in the custody or control of the state. Reed also sought this information with respect to evidence from the murders of three other women killed in Texas after his imprisonment. The district court granted Reed's discovery request solely with respect to fingerprint evidence; specifically, the court authorized that Reed obtain the production of (1) the fingerprint evidence collected from the scene of Wadle's murder that was not matched with Reed or any known person, and (2) the fingerprint evidence collected by the state of Texas from the scenes of the other three murders that has not been matched with any known person. Reed now argues that

16

the district court abused its discretion by denying the remainder of his discovery request with respect to evidence pertaining to the Wadle murder; Reed does not appear to be appealing the denial of the remainder of his request with respect to the other three murders.

The district court engaged in an extended analysis of Reed's discovery request. The court first noted the "good cause" requirement that a habeas petitioner seeking discovery must satisfy. Citing Bracy, 520 U.S. at 904, the court explained that in order to determine whether Reed met that standard, it must identify the essential elements of Reed's claim for habeas relief. The district court identified the first ground of Reed's habeas claim presented to support his discovery request as an "actual innocence" claim. Citing Herrera v. Collins, 506 U.S. 390 (1993), Robison v. Johnson, 151 F.3d 256, 267 (5th Cir. 1998), and Lucas v. Johnson, 132 F.3d 1069, 1074 (5th Cir. 1998), the district court held that "claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state court proceeding." The court therefore concluded that Reed's actual innocence claim, standing alone, was not sufficient to support his discovery request.

The district court identified Reed's second ground as a claim that the requested information was necessary for the

17

purpose of establishing a "fundamental miscarriage of justice" in response to an anticipated argument by the state that Reed's claim that the state knowingly used perjured testimony was procedurally barred. The court stated that "[i]f Petitioner's allegations establish a prima facie claim for relief on habeas corpus, he will be allowed appropriate discovery of evidence that may be likely to show his actual innocence in order to provide the necessary facilities and procedures to allow an adequate opportunity in this Court to overcome such bar." The court therefore proceeded to discuss Reed's claim that the state knowingly used perjured testimony at his trial.

The court first noted that Reed's federal habeas petition and the petition presented to the state habeas court did not include an allegation that the state knew of the falsity of McLean's testimony. The court stated, however, that Reed had submitted a declaration from a law school student assisting his case stating that McLean told him that prosecutors assisted him in fabricating testimony against Reed. The district court wrote that "[a]ssuming that these material new factual allegations could be incorporated into the amended habeas petition in this Court," Reed would have failed to exhaust state remedies by not presenting the evidence in state court. Accordingly, the court determined that it "cannot grant relief on this claim absent a sufficient justification under the law to excuse such failure to exhaust state remedies." The court stated, however, that "[p]roof

18

of actual innocence . . . can establish the kind of fundamental miscarriage necessary to overcome the imposition of the bar." The court therefore found that good cause existed for Reed to discover evidence of actual innocence.

Having concluded that good cause existed, however, the district court held that "the request stated in Petitioner's motion exceeds the proper scope of discovery in this proceeding." The court authorized the discovery of fingerprint evidence, but denied Reed's request for additional discovery of information regarding material evidence from the Wadle murder and the other three murders. The court explained that

> express representations to this Court from the Dallas County District Attorney's office and attorneys for Respondent indicate that there is presently no biological evidence from the investigation of the murder of Wanda Jean Wadle remaining in the possession of or subject to the control of prosecutorial agencies of the State of Texas other than (1) the victim's pubic hair cuttings which have not been shown to be capable of identifying a person other than the victim, and (2) evidence retained by the Dallas County Clerk from the trial which would be equally available to Petitioner's attorneys.

Accordingly, the district court found "sufficient justification for orders granting discovery of fingerprint evidence, but . . . insufficient justification for discovery orders regarding biological evidence for [DNA] testing since Petitioner has not shown that such evidence is likely to exist."

In his request for a COA on this issue, Reed first disagrees with the district court's conclusion that actual innocence, standing alone, is an insufficient basis for federal

19

habeas relief. Relying on the Supreme Court's grant of certiorari in House v. Bell, No. 04-8990, since decided by the Supreme Court at 126 S. Ct. 2064 (2006), Reed proposes that "Herrera does not foreclose all such freestanding 'actual innocence' claims." We need not decide this question, nor address the Supreme Court's decision in Bell. As explained above, the district court found that good cause existed for the discovery of evidence that would support Reed's claim of actual innocence. The district court limited Reed's discovery regarding physical evidence not because Reed's habeas claims were deficient but because Reed had failed to demonstrate that there was any likelihood that the evidence he was seeking existed.

Reed then addresses the district court's decision regarding the scope of discovery. Reed argues that "courts have authorized the use of all of the federal civil discovery rules to facilitate forensic DNA testing in habeas corpus litigation." Reed cites Toney v. Gammon, 79 F.3d 693, 700 (8th Cir. 1996), where the Eighth Circuit held that the petitioner was entitled to discovery of physical evidence for purposes of DNA testing. Toney is distinguishable from the instant case, however, because there the state "acknowledged that the exhibits from Toney's state criminal trial remain in the custody of St. Louis County authorities and are available for testing if ordered by the court." Id. Reed also relies on Jones v. Wood, 114 F.3d 1002, 1009 (9th Cir. 1997), where the Ninth Circuit stated:

20

> Jones's motion for expansion of the record, which we treat as a discovery motion, sought a court order for the FBI laboratory to conduct tests on the clothes Jones was wearing the night of the murder as well as on blood samples from both Lee and himself . . . . Jones contended that he needed this material to argue effectively that his trial lawyer had rendered ineffective assistance. We believe this to be "good cause," particularly given that there was never any hearing for the ineffective assistance claim at the state-court level.

Unlike the petitioner in Jones, Reed cannot point to specific evidence that once existed and may continue to exist that holds the potential to exonerate him. Statements to the district court by the Dallas County district attorney's office and the state's attorneys strongly indicate there is no such evidence. Reed has not shown any likelihood that physical evidence exists that would render his request for information on chain of custody more than a "fishing expedition." See Ward v. Whitley, 21 F.3d 1355, 1367 (5th Cir. 1994).

Accordingly, we conclude that reasonable jurists would not debate whether the district court abused its discretion by denying Reed's discovery request for information regarding the location and custody of physical evidence. We therefore deny Reed's request for a COA on this issue.

### 3. *Penry* Claim

Reed seeks a COA on his Penry claim, in which he argues that the former Texas capital sentencing scheme did not permit his sentencing jury to consider fully his mitigating evidence. See Penry v. Lynaugh, 492 U.S. 302 (1989). At trial, Reed presented

21

evidence concerning his prior conduct in prison, his nonviolent criminal history, his abnormal family life, and his sociopathic personality. Reed requested that the trial court instruct the jury to give full effect to the mitigating evidence he presented. The trial court denied Reed's request and instead instructed the jury that "in determining each of these special issues you may take into consideration all of the evidence submitted to you in the full trial of the case." The trial court asked the jury to answer the following three special issues:

> Special Issue I: Was the conduct of the defendant that caused the death of the deceased committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

> Special Issue II: Is there a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

> Special Issue III: Was the conduct of the defendant in killing the deceased unreasonable in response to the provocation, if any, by the deceased?

The jury answered "yes" to each question.

Reed raised his Penry claim on direct appeal. Citing Penry, the Texas Court of Criminal Appeals explained its inquiry as "whether, in the absence of instructions informing them they could consider and 'give effect' to appellant's mitigating evidence, the jury was provided with a vehicle for expressing a 'reasoned moral response' to that evidence." The court concluded that Reed's evidence "does not rise to the level that would require a special instruction on mitigating evidence."

22

The Texas court stated that Reed's evidence regarding his prison conduct and his mostly nonviolent criminal history could be given effect within the second special issue. The court determined that Reed's evidence of an abnormal childhood could be given consideration within the scope of the second issue and further stated, quoting Draughon v. State, 831 S.W.2d, 331, 338–39 (Tex. Crim. App. 1992), "[s]ympathetic as we may be to his plight during childhood and adolescence, we do not think appellant might rationally be found less morally culpable for his adult behavior on this basis, according to contemporary moral values shared by a significant segment of our society." Finally, the Texas court determined that Reed's evidence of his sociopathic personality, because it included testimony that his violent behavior would reduce with age, could be considered within the scope of the second special issue. The court therefore overruled Reed's point of error.

The district court hearing Reed's federal habeas petition also denied relief on Reed's Penry claim.[5] The district court stated that, under AEDPA, it must measure the Texas court's decision against Supreme Court precedent rather than Fifth Circuit precedent. The court noted, however, that this circuit's

---

[5] Reed did not include a Penry claim in his original federal habeas petition. After the Supreme Court decided Tennard v. Dretke, 542 U.S. 274 (2004), Reed moved for leave to amend his petition to add his Penry claim, and the district court granted the motion.

caselaw can be persuasive authority for determining whether the state court decision is an "unreasonable application" of Supreme Court precedent. Accordingly, the district court looked to several then-recent Fifth Circuit habeas decisions addressing mitigating evidence, including Bigby v. Dretke, 402 F.3d 551 (5th Cir. 2005); Brewer v. Dretke, 410 F.3d 773 (5th Cir. 2005), *rev'd,* 127 S. Ct. 1706 (2007); Coble v. Dretke, 417 F.3d 508 (5th Cir. 2005), *withdrawn by* Coble v. Dretke, 444 F.3d 345 (5th Cir. 2006); and Cole v. Dretke, 418 F.3d 494 (5th Cir. 2005), *rev'd sub nom.* Abdul-Kabir v. Quarterman, 127 S. Ct. 1654 (2007).

The district court determined that Reed's evidence of prior good conduct while in prison and his nonviolent criminal history was evidence suggesting good character. Citing Coble, the court explained that under Fifth Circuit law, evidence of good character tends to show that the crime was an aberration, and therefore good character evidence can find adequate expression under Texas's second special issue. Regarding Reed's evidence of a troubled childhood, the district court noted that "the Fifth Circuit apparently evaluates such evidence based on the degree of troubled childhood." The court concluded that Reed's evidence of a troubled childhood was on par with, or less severe than, the evidence presented in Coble and in Jacobs v. Scott, 31 F.3d 1319, 1327 (5th Cir. 1994), and therefore could be considered within the framework of Texas's special issues. Finally, regarding Reed's evidence of a psychiatric disturbance, the district court

24

determined that because the evidence indicated that Reed's tendency toward violence would go into remission as he aged, this evidence was cognizable under the second special issue. The district court therefore concluded that this circuit's precedent indicated that the Texas court's resolution of Reed's <u>Penry</u> claim was not contrary to clearly established federal law as decided by the Supreme Court. The district court denied Reed relief and also denied him a COA on this issue.

The district court decided Reed's claim without the benefit of several important developments in the caselaw. First, this court's recent en banc decision in <u>Nelson v. Quarterman</u>, 472 F.3d 287 (5th Cir. 2006) (en banc), suggests that this court has revised its view of what constitutes clearly established Supreme Court law on the question of mitigating evidence. In contrast with earlier Fifth Circuit opinions, <u>Nelson</u> emphasized that it was clearly established federal law that the jury must be able to give "*full* consideration" and "*full* effect" to a defendant's mitigating evidence. <u>Id.</u> at 297. <u>Nelson</u> maintained that under this standard, "a juror cannot be precluded from electing a sentence less than death if he believes that the mitigating evidence offered makes the defendant less morally culpable for the crime, even if he nonetheless feels compelled to answer the two special issues in the affirmative." <u>Id.</u> at 293.

Moreover, the Supreme Court has since overturned two of the Fifth Circuit decisions upon which the district court based its

25

decision, Brewer and Cole. See Brewer v. Quarterman, 127 S. Ct. 1706 (2007); Abdul-Kabir v. Quarterman, 127 S. Ct. 1654 (2007). In Brewer, the Supreme Court noted that "[i]t may well be true that Brewer's mitigating evidence was less compelling than Penry's, but contrary to the view of the CCA, that difference does not provide an acceptable justification for refusing to apply the reasoning in Penry I to this case." 127 S. Ct. at 1712. This statement suggests that this court's practice, on which the district court in Reed's case relied, of evaluating the evidence of a troubled childhood for Penry purposes based on the severity of this evidence is contrary to clearly established federal law. The Court further declared that

> [n]owhere in our Penry line of cases have we suggested that the question whether mitigating evidence could have been adequately considered by the jury is a matter purely of quantity, degree, or immutability. Rather, we have focused on whether such evidence has mitigating relevance to the special issues and the extent to which it may diminish a defendant's moral culpability for the crime.

Id. at 1712-13. The Court also criticized this circuit for having "mischaracterized the law as demanding only that such evidence be given 'sufficient mitigating effect,' and improperly equated 'sufficient effect' with 'full effect.'" Id. at 1713. These statements by the Supreme Court indicate that the fact that Reed's mitigating evidence could be considered within the scope of the special issues is not enough to satisfy Penry if Reed's evidence also had relevance to his moral culpability that the sentencing jury was not permitted to consider.

26

In light of Nelson, Brewer, and Abdul-Kabir, reasonable jurists could debate whether the district court improperly resolved Reed's Penry claim. We believe that Reed's Penry claim merits further examination, and we therefore grant him a COA on this issue.

4.  Alternative Theory Claim

Reed seeks a COA on his claim that due process forbade the trial court from allowing the jury to convict him under two alternative theories without requiring unanimity as to one. Reed notes that the jury in his trial was instructed that it could convict Reed of capital murder either under a theory of murder in the course of robbery or attempted robbery or under a theory of murder in the course of attempted aggravated rape. The relevant portion of the jury charge instructs the jury that if it decided that

> the defendant did then and there intentionally cause the death of the complainant in the course of committing or attempting to commit robbery of the complainant or in the course of attempting to commit aggravated rape of the complainant . . .

then it must "find the defendant guilty of capital murder, as charged in the indictment." In his federal habeas petition, Reed argued that because the general verdict form offered the jury only the option of finding Reed guilty or not guilty of capital murder, without specifying whether he was guilty of murder in the course of robbery or in the course of aggravated rape, it is possible that the jury did not unanimously find Reed guilty

27

either of murder in the course of robbery or murder in the course of aggravated rape.[6] Reed cited <u>Schad v. Arizona</u>, 501 U.S. 624 (1991), arguing that <u>Schad</u> held that where there is "a material difference requiring separate theories of crime to be treated as separate offenses," the United States Constitution requires separate jury findings. <u>See</u> <u>id.</u> at 633. Reed argued that, unlike that in <u>Schad</u>, his jury charge did not merely describe two different "means of commission" of the crime of murder, but rather described two separate offenses. <u>See</u> <u>id.</u> at 631.

Reed also relied on <u>United States v. Holley</u>, 942 F.2d 916 (5th Cir. 1991), where this court addressed compound jury charges in a perjury trial. There, this court held that "where a single count as submitted to the jury embraces two or more separate offenses, though each be a violation of the same statute," the trial court must instruct the jury that it must unanimously find that the defendant committed at least one of the offenses to return a guilty verdict. <u>Id.</u> at 927. Reed argued that his jury charge was analogous to the one found inadequate in <u>Holley</u>.

The district court briefly disposed of Reed's claim. The court noted that Reed raised this claim on his direct appeal and that it was rejected by the Texas Court of Criminal Appeals. The Texas court had concluded that "[w]here a statute creates a single offense, such as Tex. Penal Code Ann. § 19.03, the

---

[6] Reed's counsel raised this objection to the jury charge at trial.

different acts by which that offense may be committed may be alleged in the same count of the indictment." The Texas court further explained that the jury in Reed's case was not charged with two separate offenses, but with two alternate means of committing the offense of capital murder. The district court noted that the Texas court's disposition of this issue was a disposition under the merits under AEDPA and therefore receives the deference required by AEDPA. Citing Schad, the district court held that the Texas court's determination did not conflict with the relevant Supreme Court precedent. The court therefore denied relief to Reed on this claim and also denied him a COA.

We conclude that reasonable jurists would not debate that the Texas court's decision was a reasonable application of Supreme Court precedent. While Reed attempts to distinguish his case from the circumstances in Schad, where the Supreme Court held that the jury instructions in question were constitutionally permissible, the two cases are actually quite similar. In Schad, the defendant was tried and convicted of first-degree murder under a statute that defined first-degree murder as:

> A murder which is perpetrated by means of poison or lying in wait, torture or by any other kind of wilful, deliberate or premeditated killing, or which is committed in avoiding or preventing lawful arrest or effecting an escape from legal custody, or in the perpetration of, or attempt to perpetrate, arson, rape in the first degree, robbery, burglary, kidnapping, or mayhem, or sexual molestation of a child under the age of thirteen years . . . .

501 U.S. at 628 n.1.  At Schad's trial, the prosecution advanced

29

theories of both premeditated murder and felony murder. The trial court rejected the defendant's requested jury instruction, which would have required the jury to agree unanimously on one of the alternate theories of first-degree murder. The plurality opinion of the Supreme Court, by Justice Souter, characterized the problem thus: "petitioner's real challenge is to Arizona's characterization of first-degree murder as a single crime as to which a verdict need not be limited to any one statutory alternative . . . ." Id. at 630-31.

The plurality wrote that "[o]ur cases reflect a long-established rule of the criminal law that an indictment need not specify which overt act, among several named, was the means by which a crime was committed." Id. at 631. The plurality noted that while its earlier cases involved alternatives for proving the "requisite *actus reus*," Schad's case involved "what can best be described as alternative mental states, the one being premeditation, the other the intent required for murder combined with the commission of an independently culpable felony." Id. at 632. The plurality continued that "[w]e see no reason, however, why the rule that the jury need not agree as to mere means of satisfying the *actus reus* element of an offense should not apply equally to alternative means of satisfying the element of *mens rea*." Id.

The plurality acknowledged that "there are limits on a State's authority to decide what facts are indispensable to proof

30

of a given offense." Id. at 633. It stated that identifying these limits raised "the problem of describing the point at which differences between means become so important that they may not reasonably be viewed as alternatives to a common end, but must be treated as differentiating what the Constitution requires to be treated as separate offenses." Id. The plurality declined, however, to formulate a "single test for the level of definitional and verdict specificity permitted by the Constitution," and disapproved of this circuit's former test from United States v. Gipson, 553 F.2d 453 (5th Cir. 1977). Id. at 637. Instead, the plurality asked whether Arizona's definition of first-degree murder was consistent with the demands of due process and fundamental fairness. Id. In doing so, the plurality stated, "we look both to history and wide practice as guides to fundamental values, as well as to narrower analytical methods of testing the moral and practical equivalence of the different mental states that may satisfy the *mens rea* element of a single offense." Id.

Looking to history and current practice, the plurality found that Arizona's first-degree murder statute was derived from the traditional common law definition of murder and that numerous states defined first-degree murder very similarly to Arizona. Id. at 640-41. The plurality noted that numerous state court decisions have held that it was unnecessary for all jurors to agree upon a particular theory of first-degree murder where more

31

than one was presented. Id. at 641. The plurality concluded that "[s]uch historical and contemporary acceptance of Arizona's definition of the offense and verdict practice is a strong indication that they do not 'offen[d] some principle of justice so rooted in the traditions and conscience of our people as to be ranked fundamental.'" Id. at 642 (quoting Patterson v. New York, 432 U.S. 197, 202 (1977)).

In the second prong of its analysis, the plurality concluded that a moral equivalence between premeditated murder and felony murder "could reasonably be found, which is enough to rule out the argument that [a] moral disparity bars treating them as alternative means to satisfy the mental element of a single offense." Id. at 644.[7]

In the instant case, we are faced not with alternate theories of premeditated murder and felony murder but with alternate theories of murder in the course of a robbery and murder in the course of attempted rape. It is a reasonable application of Schad, however, to conclude that the same result obtains. Looking to the historical analysis prescribed in Schad,

_____

[7] The concurring opinion by Justice Scalia relied exclusively on historical practice. Justice Scalia wrote that
> [s]ubmitting killing in the course of a robbery and premeditated killing to the jury under a single charge is not some novel composite that can be subjected to the indignity of "fundamental fairness" review. It was the norm when this country was founded, was the norm when the Fourteenth Amendment was adopted in 1868, and remains the norm today.

Id. at 651.

we note that numerous states have traditionally defined and continue to define first-degree or aggravated murder as including both a killing in the course of robbery and a killing in the course of rape or attempted rape. See, e.g., CAL. PENAL CODE § 189 (2007); N.Y. PENAL LAW § 125.27 (2007); N.C. GEN. STAT. § 14-17; OHIO REV. CODE ANN. § 2903.01 (2006). Indeed, the Arizona statute upheld in Schad did so. Looking to Schad's moral equivalence analysis, we conclude that a court could reasonably find a moral equivalence between murder in the course of robbery and murder in the course of attempted rape.  Accordingly, we hold that reasonable jurists would not debate that the Texas court reasonably applied Schad when it rejected Reed's challenge to his jury instructions. We therefore deny Reed a COA on this issue.

5.   Circumstantial Evidence Instruction Claim

Reed seeks a COA regarding his claim that the trial court's decision to deny him the Texas circumstantial evidence instruction violated the Ex Post Facto Clause of the United States Constitution. At the time of Reed's offense, Texas law required an instruction on the law of circumstantial evidence. In Hankins v. State, 646 S.W.2d 191 (Tex. Crim. App. 1983), the Texas Court of Criminal Appeals determined that such an instruction was unnecessary. Reed sought a circumstantial evidence instruction at trial, but it was denied. On direct appeal, Reed argued that the denial of a circumstantial evidence instruction violated the Ex Post Facto Clause. The Texas Court of

33

Criminal Appeals affirmed the trial court's decision, stating simply that "[j]ury instructions on circumstantial evidence are no longer required under Texas law."  Reed renewed his argument before the state habeas court, which rejected his claim, explaining in its findings of fact and conclusions of law that "the procedural rule announced in Hankins did not increase applicant's liability for any acts he committed, did not increase the punishment for his crime, and did not deprive him of any defense that was available at the time the crime was committed."

Reed argues that the state habeas court's decision was contrary to clearly established federal law because it misinterpreted the scope of protection under the Ex Post Facto Clause. Reed contends that the state court's analysis "ignored the fourth class of ex post facto protections recognized by the Supreme Court in Calder v. Bull, 3 Dall. 386 (1798) . . . and reaffirmed in Carmell v. Texas, 529 U.S. 513 (2000) and Stogner v. California, 539 U.S. 607, 615 (2003)." According to Reed, "[t]his fourth category prohibits retroactive application of a lesser quantum of proof to an offense committed prior to the change in the law." Reed claims that the change in jury instructions implemented by Hankins did permit a lesser quantum of proof for convictions based on circumstantial evidence. Because his conviction was based in part on circumstantial evidence, Reed argues that the failure of the trial court to give the pre-Hankins jury instruction violated the Ex Post Facto

34

Clause.

The district court concluded that Reed's federal habeas petition had "failed to show that the state court's legal analysis 'resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States.'" (citing 28 U.S.C. § 2254(d)(1)). We find that conclusion not subject to debate by reasonable jurists.

Reed correctly states that Carmell reaffirmed the fourth category of ex post facto violation stated in Calder, which consists of "[e]very law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender." Carmell, 529 U.S. at 522 (quoting Calder, 3 Dall. at 390) (emphasis removed). While Calder spoke of alterations in the rules of evidence, the Court has stated, relying on Cummings v. Missouri, 71 U.S. 277 (1867), that the fourth category also includes changes to the burden of proof. Carmell, 529 U.S. at 540-41. The Court declared that "we think there is no good reason to draw a line between laws that lower the burden of proof and laws that reduce the quantum of evidence necessary to meet that burden; the two types of laws are indistinguishable in all meaningful ways relevant to concerns of the *Ex Post Facto* Clause." Id. at 541. Accordingly, Reed has identified a possible analytic error by the state habeas court in failing to address

35

the fourth category of ex post facto violations in response to Reed's claim. However, under § 2254(d), we review only the state court's ultimate decision, and not its reasoning in reaching that decision. Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002) (en banc). We find that Reed has failed to show that the state court's ultimate decision was contrary to clearly established federal law.

Reed has failed to demonstrate that the trial court's decision to omit the circumstantial evidence instruction falls into Calder's fourth category of ex post facto violation, for he has not shown that the omission of this instruction resulted in a lesser quantum of proof being required. Reed argued in his habeas petition that the Hankins court acknowledged that omitting the circumstantial evidence instruction would result in a lesser quantum of proof being required. He claimed that the Hankins court had found that the instruction in question had imposed a higher burden than that required for direct evidence, citing the court's statement that the instruction "erroneously suggest[ed] 'that proof of circumstantial evidence is subject to a more rigorous standard than is proof by direct testimonial evidence.'" Hankins, 646 S.W.2d at 198 (quoting State v. LeClair, 425 A.2d 182 (Maine 1981)). This quotation is ambiguous: it could mean, contra Reed, that the court found that the instruction "suggested" a separate standard of proof without actually creating such a standard, and that this suggestion was

36

"erroneous" because the proper standard of proof was elsewhere established.  We believe that a full reading of Hankins reveals that the Texas court concluded not that the circumstantial evidence instruction had established a separate and distinct burden of proof, but rather that it confused the jury as to the proper burden.

The Hankins court stated firmly that "there is but one standard of proof for criminal convictions and where the jury is properly instructed on that standard, a charge on circumstantial evidence is valueless and invites confusion." Id. at 199. The court reiterated that "[t]he constitutionally required burden of proof of criminal cases 'is that the State establish all elements of the offense beyond a reasonable doubt.'" Id. (quoting Crocker v. State, 573 S.W.2d 190 (Tex. Crim. App. 1978)). The court further declared that "[r]ather than aiding jurors in applying the reasonable doubt standard, an additional charge on circumstantial evidence focusing on the 'reasonable hypothesis' theory serves only to distract jurors from examining the proper standard of proof as the primary focus of their deliberations." Id. Thus the court emphasized that there has been only one standard of proof for direct and circumstantial evidence--beyond a reasonable doubt. The court also emphasized that the circumstantial evidence instruction confused jurors and potentially distracted them from applying this single standard. Thus the Hankins court clearly represented that its decision on

37

jury instructions did not effect a substantive change in the law.

While we are not bound by the Hankins court's characterization of the effect of its decision, see Carmell, 529 U.S. at 544 n.31, we find that characterization to be persuasive. There can be no ex post facto violation where a court merely clarifies the law without making substantive changes. See Thompson v. Nagle, 118 F.3d 1442, 1449 (11th Cir. 1997) ("When a court clarifies but does not alter the meaning of a criminal statute, the Ex Post Facto Clause is not implicated."); see also United States v. Brennan, 326 F.3d 176, 197 (3d Cir. 2003); Smith v. Scott, 223 F.3d 1191, 1194-96 (10th Cir. 2002). We therefore conclude that reasonable jurists would not debate that the district court correctly decided that the state court did not reach a decision contrary to clearly established federal law in rejecting Reed's ex post facto claim. Accordingly, we deny Reed's request for a COA on this issue.

6. Appellate Delay Due Process Claim

Reed seeks a COA for his claim that he was denied due process by the extended delay in the Texas Court of Criminal Appeals' resolution of his direct appeal. Reed was convicted and sentenced in March 1983. The record on appeal was approved by the trial court in May 1984, and the case was submitted upon oral argument on April 23, 1986. The Texas Court of Criminal Appeals did not act on Reed's appeal until November 1992, when the court remanded the case for a retroactive Batson hearing. Following the

38

hearing, the trial court filed its findings of fact and conclusions of law on May 6, 1993. The parties submitted briefs in July and September 1993. After another year-and-a-half delay, the Court of Criminal Appeals issued an opinion affirming Reed's conviction on March 29, 1995.

Reed argued in his state habeas petition that this extended delay violated his federal due process rights. The state habeas court held that "a showing of substantial prejudice to the appellate process is a necessary condition for granting habeas relief . . . ." The court decided that Reed "ha[d] failed to prove by a preponderance of the evidence that any delay by the CCA in adjudicating his mandatory direct appeal substantially prejudiced his appeal in any manner."

In Reed's federal habeas case, the district court concluded that the state court's decision was not contrary to or an unreasonable application of clearly established federal law. The court agreed with the state habeas court that Reed had failed to demonstrate substantial prejudice, arguing that the "bulk of any prejudice arising from the delay fell on the State." The court explained that "[b]y the time of the retrospective Batson hearing, the prosecutors had forgotten why they exercised their peremptory challenges." The court further noted that developments in Supreme Court caselaw had helped Reed, citing Batson, Miller-El, Tennard, and Smith v. Texas, 543 U.S. 37 (2004). The district court therefore rejected Reed's habeas claim and denied him a COA

39

on this issue.

Reed now seeks a COA, arguing that "the District Court erred in finding that the State was prejudiced more than [himself]." Reed argues that he "lost the opportunity to investigate aspects of the case while memories were fresh, or before the State 'lost' or destroyed all physical evidence from the crime scene that might have exonerated him." Reed argues that "no reasonable jurist could conclude that [he] has any interest in further delaying his vindication, especially when such delay makes that ultimate vindication ever harder to achieve."

We need not reach the question of prejudice, however, because we hold that there is no Supreme Court decision sufficiently on point to permit the conclusion that the state court decision was "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). That is, there is no Supreme Court decision holding that excessive delay in a direct appeal is a violation of the Due Process Clause of the United States Constitution.

Reed relies on the numerous circuit court decisions that do so hold, and that explain their holdings as the logical application of Supreme Court precedent. Reed cites Rheuark v. Shaw, 628 F.2d 297, 302 (5th Cir. 1980), where this circuit held that "due process can be denied by any substantial retardation of the appellate process . . . ." We explained that while "[t]he

40

Constitution does not require the states to afford a right to appellate review of a criminal conviction," "[n]evertheless, when a state provides a right to appeal, it must meet the requirements of due process and equal protection." Id. We cited the Supreme Court decisions Douglas v. California, 372 U.S. 353 (1963) and Griffin v. Illinois, 351 U.S. 12 (1956), in support of this proposition.

Other circuits have reasoned similarly. Quoting Evitts v. Lucey, 469 U.S. 387, 393 (1985), the Third Circuit declared that "[i]t is axiomatic that once an appeal as of right has been granted, 'the procedures used in deciding appeals must comport with the demands of the Due Process [] Clause[] of the Constitution.'" Simmons v. Beyer, 44 F.3d 1160, 1169 (3d Cir. 1995). The court went on to explain that "[a]lthough the Supreme Court has not explicitly recognized a criminal defendant's right to a speedy appeal, in Burkett v. Cuningham, 826 F.2d 1208 (3d Cir. 1987) (Burkett I), we held that the Due Process Clause 'guarantees a reasonably speedy appeal if the state has chosen to give defendants the right to [appeal].'" Id.

The Tenth Circuit has also held that "a habeas petition may be predicated on a due process violation arising from the state's delay in adjudicating a petitioner's direct criminal appeal . . . ." Harris v. Champion, 15 F.3d 1538, 1557 (10th Cir. 1994). In justifying its holding, the court explained that the right to a speedy trial is a fundamental right imposed on the states by the

Due Process Clause of the Fourteenth Amendment. <u>Id.</u> at 1558

(citing <u>Barker v. Wingo</u>, 407 U.S. 514, 515 (1972)). The court

stated that while the Constitution does not require that a state

afford a criminal defendant a direct appeal, the Supreme Court

has held that:

> if a State has created appellate courts as "an integral
> part of the . . . system for finally adjudicating the
> guilt or innocence of a defendant," <u>Griffin v. Illinois</u>,
> 351 U.S. at 18, the procedures used in deciding appeals
> must comport with the demands of the Due Process and Equal
> Protection Clauses of the Constitution.

<u>Id.</u> (quoting <u>Evitts</u>, 469 U.S. at 393). The court noted that the

Supreme Court had held that, to ensure a defendant's right to a

meaningful appeal, the State must afford counsel to an indigent

defendant, the counsel must be effective, and an indigent

defendant must be provided with a free transcript of the trial

proceedings. <u>Id.</u> (citing <u>Evitts</u>, 469 U.S. at 396, <u>Douglas</u>, 372

U.S. at 358, and <u>Griffin</u>, 351 U.S. at 19-20). The court concluded

that "an appeal that is inordinately delayed is as much of a

'meaningless ritual' as an appeal that is adjudicated without the

benefit of effective counsel or a transcript of the trial court

proceedings." <u>Id.</u> (internal citations omitted).

In accord with these decisions, the Second Circuit has held

that:

> The Supreme Court has not yet directly addressed the issue
> of whether the Constitution guarantees a speedy criminal
> appeal, once an opportunity for an appeal is provided. The
> lower federal courts, however, have grappled with the
> question, and it is now clear in this circuit that
> substantial delay in the state criminal appeal process is

42

> a sufficient ground to justify the exercise of federal
> habeas jurisdiction.

Cody v. Henderson, 936 F.2d 715, 718 (2d Cir. 1991). Other
circuit courts that have held that excessive appellate delay can
constitute a due process violation include the Fourth Circuit
(United States v. Johnson, 732 F.2d 379, 381 (4th Cir. 1984)),
the Ninth Circuit (United States v. Turner, 8 F.3d 673, 676 (9th
Cir. 1993) (en banc)), and the First Circuit (United States v.
Pratt, 645 F.2d 89, 91 (1st Cir. 1981)).

These decisions reveal that a majority of circuit courts
have held that the principle that excessive appellate delay may
violate the Due Process Clause is a logical application of
Supreme Court precedent concerning the right to a speedy trial,
see Barker, and the right to a meaningful appeal where appeal is
afforded, see Evitts, Douglas, and Griffin. Nevertheless,
consensus of this kind is insufficient under AEDPA to permit this
court to overturn a state court decision holding that an
appellate delay did not constitute a due process violation.

As stated above, AEDPA limits the relevant area of law to
which we may look when addressing a habeas petition to "clearly
established Federal law, as determined by the Supreme Court of
the United States." 28 U.S.C. § 2254(d)(1). The Supreme Court has
explained that "[i]f this Court has not broken sufficient legal
ground to establish an asked-for constitutional principle, the
lower federal courts cannot themselves establish such a principle

43

with clarity sufficient to satisfy the AEDPA bar." <u>Williams v.</u> <u>Taylor</u>, 529 U.S. 362, 381 (2000). The circuit courts have elaborated on this idea. Citing <u>Williams</u>, the Ninth Circuit held that any principle upon which a habeas petitioner seeks to rely must be found in the holdings of Supreme Court decisions, and that "decisions of that Court are the only ones that can form the basis justifying habeas relief." <u>Hernandez v. Small</u>, 282 F.3d 1132, 1140 (9th Cir. 2002). Similarly, the Eleventh Circuit declared that "[c]learly established federal law is *not* the case law of the lower federal courts, including this Court," but rather the holdings of Supreme Court decisions. <u>Putnam v. Head</u>, 268 F.3d 1223, 1241 (11th Cir. 2001).

The Third Circuit has stated that "the primary significance of the phrase 'as determined by the Supreme Court of the United States' is that federal courts may not grant habeas corpus relief based on the state court's failure to adhere to the precedent of a lower federal court on an issue that the Supreme Court has not addressed." <u>Matteo v. SCI Albion</u>, 171 F.3d 877, 890 (3d Cir. 1999). The court noted, however, that "we do not believe federal habeas courts are precluded from considering the decisions of the inferior federal courts when evaluating whether the state court's application of the law was reasonable." <u>Id.</u> The court further explained that "in certain cases it may be appropriate to consider the decisions of inferior federal courts as helpful amplifications of Supreme Court precedent." <u>Id.</u>

44

The First Circuit has also articulated a nuanced view of the value of lower federal court opinions. In Ouber v. Guarino, 293 F.3d 19, 26 (1st Cir. 2002), the court stated that:

> The AEDPA also requires that the relevant legal rule be clearly established in a Supreme Court holding, rather than in dictum or in holdings of lower federal courts. This does not mean, however, that other federal court decisions are wholly irrelevant to the reasonableness determination. To the extent that inferior federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness vel non of the state court's treatment of the contested issue. Reference to such cases may be especially helpful when the governing Supreme Court precedent articulates a broad principle that applies to a wide variety of factual patterns.

(internal citations omitted). The First Circuit has cautioned, however, that the "section 2254(d)(1) inquiry--whether the Supreme Court has prescribed a rule that governs the petitioner's claim--requires something more than a recognition that the Supreme Court has articulated a general standard that covers the claim." O'Brien v. Dubois, 145 F.3d 16, 24 (1st Cir. 1998).

In light of these statements interpreting § 2254(d)(1), we conclude that Reed's habeas claim must fail. We find that the Supreme Court has not "broken sufficient legal ground" on the subject of appellate delay as a due process violation to "satisfy the AEDPA bar." See Williams, 529 U.S. at 381. Whether appellate delay may constitute a due process violation is "an issue that the Supreme Court has not addressed." See Matteo, 171 F.3d at 890. While the conclusion that appellate delay violates the Due Process Clause, as we have seen, can be derived from existing

Supreme Court holdings, this derivation requires more than a mere application of Supreme Court precedent to a new factual scenario. See Ouber, 293 F.3d at 26. The Supreme Court-articulated principle upon which the Rheuark, Simmons, and Cody decisions, et al., were based--that where appellate process is offered, it must comply with due process--is an exceedingly general one. Thus, these circuit court decisions were more than "helpful amplifications of Supreme Court precedent," see Matteo, 171 F.3d at 890; these decisions broke new legal ground. Accordingly, these circuit court decisions cannot form the basis of a successful habeas claim. We conclude that reasonable jurists would not debate whether the district court erred by rejecting Reed's habeas claim, and we therefore deny Reed a COA.

   7.   Eighth Amendment Claim

   Reed argues that to execute him after his extended stay on death row, attributable mainly to delay by the state, would violate the Eighth Amendment's prohibition on cruel and unusual punishment. The state court rejected Reed's Eighth Amendment claim as unsupported by existing law. Concluding that the state court's decision was not contrary to or an unreasonable application of clearly established federal law, the district court denied habeas relief on this claim and also denied Reed a COA.

   Reed now seeks a COA from this court, arguing that "reasonable jurists can--and do--disagree" about whether

46

execution after extraordinary delay violates the Eighth Amendment. Reed misapprehends our inquiry under AEDPA. Our task is to determine whether reasonable jurists would debate whether the state court misapplied clearly established federal law. Reed points to no decisions of the Supreme Court or of other federal courts holding that execution after a significant delay may violate the Eighth Amendment. In his brief before this court, Reed cites only dissenting opinions and law review articles. These sources are inadequate to create doubt regarding whether the state court misapplied clearly established federal law. Moreover, the caselaw of this circuit squarely supports the state court's decision. In White v. Johnson, 79 F.3d 432, 436-40 (5th Cir. 1996), where the petitioner raised a similar claim, we stated that "[n]o other circuit has found that inordinate delay in carrying out an execution violates the condemned prisoner's eighth amendment rights," and, addressing his claim on the merits, we held that the petitioner had not been subjected to cruel and unusual punishment on account of the delay. See also Lackey v. Johnson, 83 F.3d 116 (5th Cir. 1996); Fearance v. Scott, 56 F.3d 633, 635-40 (5th Cir. 1995). We therefore deny Reed a COA on this issue.

   8.   Lesser Included Offense Instruction Claim

   Reed seeks a COA for his claim that the trial court violated his due process rights by denying his requested jury instruction on first-degree, non-capital murder as a lesser included offense.

47

Reed founds this claim on Beck v. Alabama, 447 U.S. 625 (1980), where the Supreme Court struck down as a violation of due process an Alabama law barring trial judges from giving lesser included offense instructions in capital cases. Beck held that "the jury must be permitted to consider a verdict of guilt of a noncapital offense 'in every case' in which 'the evidence would have supported such a verdict.'" Hopper v. Evans, 456 U.S. 605, 610 (1982) (quoting Beck, 447 U.S. at 643, 627). Thus, "Beck held that due process requires that a lesser included offense instruction be given when the evidence warrants such instruction." Id. at 611.

This court has held that "Beck's holding applies when the state trial court refuses a lesser included offense instruction." Cordova v. Lynaugh, 838 F.2d 764, 767 (5th Cir. 1998). We explained that "the source of that refusal, whether by operation of state law or refusal by the state trial court judge, is immaterial." Id. at 767 n.2.[8] In applying Beck's mandate, we adopted the federal standard, that "a lesser included offense instruction should be given 'if the evidence would permit a jury rationally to find [a defendant] guilty of the lesser offense and

_____

[8] In contrast to the circuit caselaw on appellate delay discussed above, we view this holding as a "helpful amplification[] of Supreme Court precedent" rather than as a holding that breaks new legal ground. See Matteo, 171 F.3d at 890. As Cordova explains, Beck's holding--that a lesser included offense instruction must be given when the evidence warrants such instruction--contains no limitations that might preclude it from being applied to decisions by judges as well as legislatures.

48

acquit him of the greater.'" Id. (quoting Hopper, 465 U.S. at 612). We explained that "the federal standard . . . is equivalent to the Beck standard that a lesser included instruction must be given when the evidence would have supported such a verdict." Id. We concluded that "in a capital case, the jury must be allowed to consider a lesser included noncapital offense if the jury could rationally acquit on the capital crime and convict for the noncapital crime." Id.

Reed was convicted under Texas Penal Code § 19.03(a)(2), which at the time stated that a person committed capital murder who "intentionally commits the murder in the course of committing or attempting to commit" one of several enumerated felonies, including "robbery" and "aggravated rape."[9] Reed was convicted of murder "while in the course of committing and attempting to commit robbery and in the course of attempting to commit aggravated rape." As its language makes clear, § 19.03(a)(2) applies only when the killing was both intentional and committed in the course of committing or attempting to commit a specified felony. Under § 19.03(a)(2), unlike under the felony murder doctrine, the felony does not supply the requisite mens rea; rather, there must be an independent intent to take a life. See Lamb v. State, 680 S.W.2d 11, 15 (Tex. Crim. App. 1984).

---

[9] Acts 1983, 68th Leg., p. 5317, ch. 977, § 6, subsec. (a), subd. (2), substituted "sexual assault" for "rape."

49

The Texas courts have defined "in the course of committing" an offense under § 19.03(a)(2) as "conduct occurring in an attempt to commit, during the commission, or in the immediate flight after the attempt or commission of the offense." Garrett v. State, 851 S.W.2d 853, 856 (Tex. Crim. App. 1993) (citing Riles v. State, 595 S.W.2d 858, 862 (Tex. Crim. App. 1980)). The courts have stated, with respect to robbery, that "[e]vidence is sufficient to support a capital murder conviction if it shows an intent to obtain or maintain control of property which was formed before or contemporaneously with the murder." Id. They have further stated that "proof of a robbery committed as an 'afterthought' and unrelated to a murder would not suffice" to prove capital murder. O'Pry v. State, 642 S.W.2d 748, 762 (Tex. Crim. App. 1982). Presumably, these principles apply to rape as well.

Reed sought a jury instruction on the lesser included offense of first-degree murder. Under Texas law, first-degree murder is committed when the accused "intentionally or knowingly causes the death of an individual." TEX. PEN. CODE ANN. § 19.02(a)(1) (Vernon 1974). The trial court denied Reed's request.

Reed objected to the trial court's decision in his direct appeal to the Texas Court of Criminal Appeals. Stating its inquiry as "whether there is evidence in the record from which a jury could rationally find a defendant is guilty only of the

50

lesser offense," the Texas court denied Reed's claim. The court noted that rather than denying commission of robbery or sexual assault, Reed "swore that he did not commit any of the actions of which he was accused." The court declared that "there was no evidence admitted to prove either that appellant did not intend to commit the robbery and the aggravated rape, or to show that they did not occur." The court concluded, "[w]e find there was no evidence at trial that tended to establish appellant was guilty only of murder, so that a rational trier of fact could have reached that conclusion."

In Reed's federal habeas proceedings, the district court held that Reed had failed to show that the Texas court's legal analysis resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law. The district court further held that Reed "failed to rebut by clear and convincing evidence the presumption that the CCA's fact findings were correct." The district court therefore denied Reed's habeas claim as well as his request for a COA.

In his habeas petition, Reed challenged the Texas court's fact-finding regarding the nature of the evidence presented at his trial. As stated earlier, when state court fact-finding is at issue, the federal habeas court must assess whether the state court decision is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Leal, 428 F.3d at 548. "The

51

state court's findings of fact are entitled to a presumption of correctness and the petitioner may overcome that presumption only by clear and convincing evidence." Leal, 428 F.3d at 548 (citing 28 U.S.C. § 2254(e)(1)).

We believe that reasonable jurists could debate whether the district court erred by concluding that Reed had not overcome the presumption in favor of the state court's fact-finding. We find that Reed has pointed to evidence tending to show that Wadle's murder was not committed in the course of attempted robbery or attempted aggravated rape. Reed notes that Wadle's autopsy indicated "no evidence of trauma to the victim's genitalia, internally or externally." Other than the victim's nudity, the only evidence of an intent by Reed to commit rape came from McLean, whose testimony was questionable. Reed therefore proposes that a rational jury could have found Reed guilty of murder, but not rape or attempted rape.

Reed also argues that a rational jury could have concluded that Reed committed murder, but not "in the course of committing or attempting to commit" robbery. He notes that the court of appeals, in affirming the trial court's refusal to give his requested instruction, pointed to Pursley's testimony that Reed had robbed her and that Wadle's purse was lying on the couch with its contents spilled when Pursley entered the apartment. Reed argues that to move from this evidence to the conclusion that he committed murder "in the course of committing a robbery" requires

an inference by the jury. Reed relies on Cordova, where we held that the Texas court had erred by refusing a lesser included offense instruction. There, the state presented circumstantial evidence that the defendant was guilty of robbery as a party--the defendant was "the leader of the gang," he "did the talking," and he robbed another victim--and argued that this evidence showed that the defendant had a prior agreement to rob the decedent. 838 F.2d at 769. We responded that "[t]he problem is that the jury could reject that inference." Id. Reed proposes that Cordova holds that "where the jury was required to draw an inference of an intent to commit robbery, the evidence was such that the jury might rationally have rejected the inference."

Reed may be taking Cordova too far. Cordova does not state that in any case where the jury must draw any kind of inference, a lesser included offense instruction is required. Rather, the court repeatedly emphasized that the evidence of an agreement to rob in that case was "circumstantial and ambiguous." Id. at 770. Harmonizing Cardova with our earlier caselaw interpreting Beck, we can conclude that if a *rational* jury could reject the inference that the murder was in the course of committing or attempting to commit the felony in question, then the defendant is entitled to a lesser included offense instruction.

Thus interpreted, however, Cordova still lends support to Reed's position. If Reed is correct that the evidence against him reached a level of ambiguity that a rational jury might reject

the inference that he committed murder "in the course of committing robbery or attempted robbery," then Cordova supports Reed's conclusion that a lesser included offense instruction was warranted.

To the extent that the state court, in denying Reed's appeal, relied on the fact that Reed did not specifically argue at trial that he committed murder but not murder "in the course of committing or attempting to commit" robbery or aggravated rape and did not present evidence to that effect, we hold that reasonable jurists could debate whether this reliance was an unreasonable application of clearly established federal law. The Supreme Court's and this court's precedent does not clearly indicate that a defendant who denies any involvement in the crime of which he is accused is not entitled to a lesser included offense instruction. While the defendant in Beck did admit to robbery, while denying the murder charge against him, this fact was not essential to the Court's reasoning or holding. Beck holds that the jury must be permitted to consider a verdict of guilt of a noncapital offense "in every case" in which "the evidence would have supported such a verdict." Hopper, 456 U.S. at 610. Thus, Beck focuses on the trial evidence, not the defendant's theories. Moreover, Beck does not state that the evidence must be supplied by the defendant to warrant consideration.

Our decision in Cordova is consistent with the conclusion that a defendant who protests his complete innocence may receive

54

a lesser included offense instruction. In <u>Cordova</u>, we held that the defendant was wrongfully denied a lesser included offense instruction without any discussion of the theories or evidence that the defendant presented at trial. Allowing a lesser included offense instruction where the evidence provided by the prosecution permits it is also consistent with the normal allocation of burdens in a criminal trial. A contrary approach, which would require the defendant to admit to the commission of crime to obtain the benefit of the lesser included offense instruction, could raise serious due process concerns.[10]

---

[10] The Tenth Circuit has held that a district court cannot deny a defendant's request for a lesser included offense instruction on the basis that the defendant claims he is innocent. <u>Hooker v. Mullin</u>, 293 F.3d 1232, 1238 (10th Cir. 2002); <u>Mitchell v. Gibson</u>, 262 F.3d 1036, 1050 (10th Cir. 2001). The Tenth Circuit further held that a state court's refusal to give a lesser included offense instruction on account of the defendant's claim of innocence was "contrary to or involve[d] an unreasonable application of clearly established federal law as determined by the Supreme Court." <u>Mitchell</u>, 262 F.3d at 1050.

Citing <u>Hopper</u>, the Tenth Circuit has explained that "[t]he Supreme Court requires courts to look at all evidence in the record to determine whether a lesser included offense instruction should have been given" and that "[a]lthough an inconsistent trial theory may indicate a lack of evidence for a <u>Beck</u> instruction, it does not definitively establish that fact." <u>Robedeaux v. Gibson</u>, No. 98-6021, 1999 U.S. App. LEXIS 15790 at *17-18 (10th Cir. July 8, 1999) (unpublished). The Tenth Circuit further proposed that "<u>Schad v. Arizona</u> implicitly affirmed the idea that a lesser included instruction that is supported by the evidence can satisfy <u>Beck</u>, even if it is inconsistent with the defendant's theory of the case." <u>Id.</u> at *18 n.4 (internal citations omitted). In <u>Schad</u>, the Court upheld a defendant's conviction after the trial court gave a lesser included instruction on second degree murder that was inconsistent with defendant's trial theory. 501 U.S. 624, 645-48 (1991).

We note that the Eighth Circuit takes a different view, having held that "where 'the defendant claimed complete innocence

Because reasonable jurists could debate whether the state court decision is "based on an unreasonable determination of the facts" and whether the state court decision "involved an unreasonable application of clearly established federal law," we grant Reed a COA on this claim.

### III. REED'S *BATSON* CLAIM

The district court granted Reed a COA on his claim that the prosecution violated his rights under the Sixth and Fourteenth Amendments by the racially discriminatory use of its peremptory challenges. See Batson v. Kentucky, 476 U.S. 79 (1986). The parties have briefed this claim on the merits. Because we are granting three of Reed's additional requests for a COA, however, we have decided to defer consideration of Reed's Batson claim until both parties have had the opportunity to brief on the merits the additional habeas claims for which we have herein granted a COA.

### IV. CONCLUSION

For the foregoing reasons, Reed's Application for a Certificate of Appealability is GRANTED IN PART and DENIED IN PART. The Clerk of the Court will set out a briefing schedule for the issues on which we have granted a COA.

---

throughout the trial' . . . there is no rational basis for a lesser included offense instruction." United States v. De Noyer, 811 F.2d 436, 441 (8th Cir. 1987) (quoting United States v. Elk, 658 F.2d 644, 649 (8th Cir. 1981)).