**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**
_____

No. 96 - 20005
_____


LARRY WAYNE WHITE,

Petitioner-Appellant,

VERSUS

GARY L. JOHNSON, DIRECTOR, TEXAS DEPT.
OF CRIMINAL JUSTICE, INSTITUTIONAL DIVISION,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

March 21, 1996

Before DAVIS, BARKSDALE, and DeMOSS, Circuit Judges

DAVIS, Circuit Judge:

Petitioner White applies for a certificate of probable cause to appeal the district court's denial of habeas relief. White claims that his pending execution will violate his eighth amendment right to be free from cruel and unusual punishment and fourteenth amendment right to due process of law and that he received ineffective assistance of counsel. We vacate our stay of White's execution and deny White's application for a certificate of probable cause.

                              I.

In June 1979, White was convicted of the March 1, 1977 murder of Elizabeth St. John at her apartment house, where White worked as

a maintenance man.  The facts of the crime are accurately set out in the opinion of the Court of Criminal Appeals originally affirming White's conviction:

> [T]he 72-year-old complainant, Elizabeth St. John, moved from the Austin area to return to Houston, in late February of 1977, about a year after her husband had died.  Mrs. St. John moved in with Lavelle Wasson, her friend of 25 years, who owned some apartment complexes.  St. John was to occupy number three, an upstairs apartment of the Airline complex which was in front of the Wasson's house.
>
> [White] had been employed by the Wassons to do maintenance work at their Shepard apartment complex.  On Monday, Tuesday and part of Wednesday of the first week in March, [White] and Wasson spent their time painting St. John's apartment while she looked on.  Her furniture had already been moved in, so they "painted around it."
>
> As the three left the apartment on Wednesday afternoon, St. John pointed out a locking devise she had installed on her door that made it impossible to turn the knob or open the door from the outside, even with a key.  Wasson asked [White] to move a box spring mattress that was in a hall corner across from St. John's apartment.  [White] said he would carry it out the next day.
>
> [White] asked St. John if she were planning to stay up in the apartment that night; she told him "yes."
>
> Later in the day, St. John returned to Wasson's house to obtain envelopes and paper for writing her children, then headed back to her apartment.  [White] also came by Wasson's house to return keys to a storage room.  Before he left, [White] told Wasson -- who was also an elderly lady -- "Bell, that sure is a cute jumpsuit.  I like what's in it."  Wasson passed the comment off.  [White] told Wasson he was going back to the Shepard Apartments.
>
> However, before Wasson went to bed at 8:30 or 9:00 p.m., she noticed [White's] car was still parked in the parking lot.  She also noticed St. John's car in the lot in front of the complex.
>
> At approximately 10:30 p.m Wasson and her husband were awakened by the tenant across the hall from St. John who reported the mattress in the hall had been "completely engulfed" in flames.  After the tenant had doused the flames and reported the incident to the Wassons, they all returned to the hall, pulled the mattress out to a front balcony, threw it down to the ground and poured more

2

water on it.

Wasson at this point noticed [White's] white Valiant was still parked out front. St. John's Pinto, however, was gone. Wasson assumed her friend had gone to visit the people who had moved her to Houston.

Wasson had told St. John she had an early doctor appointment on Thursday, March 3rd, but she would be up to the apartment to measure for blinds after that. When Wasson went to the apartment at 8:30 or 9:00 a.m., she noticed [White's] car was still there and St. John's was still gone.

Because the special lock was still on the door and St. John's car was gone, Wasson became alarmed. She went home and told her husband they needed to see about St. John, that something was wrong. No telephone had been installed in St. John's apartment. Just as the Wassons were leaving, Pat McGill, the manager of Shepard Apartments (and [White's] boss) called and said something that caused Wasson concern about St. John. She told McGill to come over.

About dusk on March 3rd, McGill and Wasson went to St. John's apartment door. Mrs. McGill crawled through a window, accessible from the balcony. She told Wasson, "Bell, she's in there dead." Dave Calhoun and L. E. Doreck of the Houston Police Department Homicide Division were the first officers on the scene. Because of the lock device on the door, the officers had to break it in. The temperature in the apartment was so hot in the March evening, it was "staggering." Calhoun discovered a gas floor heater was on as high as it would go. The apartment was neat; there was no sign of forced entry or a struggle. St. John's body, clothed only in a bra, pullover blouse and stockings which were rolled to the ankle, was covered with a blanket. Upon uncovering the body, Calhoun observed bruises on the chin, neck and throat. When the body was rolled over, the officers found a screwdriver protruding from the lower back.

Eduardo Bellas, M.D., a Harris County assistant Medical Examiner who assisted in the autopsy, would later testify the 92 pound, 5'4" St. John, a woman of "slight" build had died as a result of "two mechanisms of death": asphyxia due to strangulation; and, the penetration of the screwdriver four inches into the diaphragm, liver and right chest cavity. There was no evidence of defensive wounds. Acid phosphates tests and microscopic study of vaginal swabs revealed sexual intercourse had occurred within 24 hours of the discovery of the body. Bellas opined St. John had been stabbed first, then strangled, but stated there was no way to be sure. In addition to

3

the clothing, six gold rings and small diamond stud earrings remained on the body.

At the crime scene, Calhoun was directed to the white Valiant in the parking lot in which [White] had recently arrived after a trip to Florida. The National Crime Information Center (NCIC) computer indicated the car was "wanted." Officer Joe Herrin who was in charge of the mobile crime scene unit, attempted to lift finger prints off of things "the suspect would touch," such as the front door, the screwdriver and the car "that was wanted in another homicide." One print was lifted off a Coors beer can found in the white Valiant.

Homicide Sergeant D. R. James went through St. John's purse which was found in the apartment. Identification and other papers were obtained from the purse, but "nothing of great value." James testified he would have checked the purse for money and valuables, and did not recall finding any money.

Another Homicide Detective, John L. Bonds, went to the scene the following morning, Friday, March 4th, to do follow up investigation. He checked out the missing car which had belonged to the victim and found it registered to her. He entered it into the NCIC, requesting a hold on the vehicle and any occupant for examination of evidence. Norbent L. LeBlanc, a senior latent print examiner, testified none of the prints lifted from the apartment or the Valiant, other than the one off the Coors can, could be identified as [White's}.

Three days later, at 3:23 a.m. on March 8th, Police Officer Donald Edge of Myrtle Beach, South Carolina, was patrolling the south end of the deserted resort town. He observed [White] near a restaurant which was closed for the "off season." About three feet away from [White] was parked a light green Fort Pinto station wagon bearing Texas tags. The driver's door was open. Edge arrested [White], warned and searched him. Edge found a set of keys in [White's] left front pocket; the keys fit the ignition and doors of the Pinto.

Numerous objects were in the Pinto, "ranging from jewelry to tools to a stereo plus clothing." The glove compartment was open, and from it Edge obtained the car registration papers. The car was registered to Elizabeth St. John of Leander, Texas.

Lieutenant Mitchell Glen Kemp was the Investigator on call in Myrtle Beach on March 9th. He arrived on the scene of [White's] arrest at about 3:30 a.m., then back at the station around 4:00 a.m. For the next five hours, Kemp was "gathering information," by computer, as well as

from speaking with officers in Houston by telephone regarding [White] "and a homicide in Houston." Kemp and his supervisor, Lieutenant Luke, interviewed [White] starting at around 10:00 a.m. [White] waived his rights and his inculpatory statement was reduced to writing. The salient content of that statement, admitted before the jury, is as follows:

> The car that I was in this morning came from Houston, Texas. I took it from the Airline Apartments in Houston, after I choked Ms. Elizabeth St. John and stabbed her in the back with a screwdriver. I was drinking at the time and she had offered to give me a bonus of $20.00 for painting work I had done. I met Ms. St. John through the manager of the apartments when I was working at the apartments. I was in Houston for about a week before I killed her. I killed Ms. St. John a week ago Tuesday; it has been one week ago today, and I left the screwdriver there . . . . we had had intercourse on the couch before I killed her. I would say that she was 52 to 56 years old maybe . . . . After I choked her and stabbed her, I left Houston that night and I took the stereo that is in the car now, $45-50, a lamp, and jewelry that is in the toolbox on the front seat. I got to Myrtle Beach last night between 6:00 and 6:30 P.M. and went to Dorothy's Green Bar or Green Lounge.

White v. State, 779 S.W.2d at 812-814 (footnotes deleted).

On appeal, White's conviction and sentence were affirmed. White v. State, 610 S.W.2d 504 (Tex. Crim. App. 1981). His state collateral attack, filed in June 1981, was denied late that month and his execution date was set for July 1, 1981. White then filed an application for federal habeas relief which was granted by the district court and affirmed by this court. White v. Estelle, 554 F.Supp. 851 (S.D. Tex. 1982). White v. Estelle, 720 F.2d 514 (5th Cir. 1983). Our mandate issued in early 1984.

On retrial in August 1984, White was again convicted of murder and sentenced to death. Five years later, following an automatic appeal, the Texas Court of Criminal Appeals affirmed the second judgment and sentence. White v. State, 779 S.W.2d 809 (Tex. Crim.

5

App. 1989). An application for a writ of certiorari was denied by the United States Supreme Court on May 29, 1990. White v. Texas, 493 U.S. 962 (1990). White filed an application for state habeas relief in 1990. Three and one half years later, on March 22-24, 1994, an evidentiary hearing was held on his claim of ineffective assistance of counsel. White supplemented his petition on May 12, 1995 with an eighth amendment claim of cruel and unusual punishment due to the inordinate delay between his sentencing and the execution of the death penalty. After the petition had been pending for five years, the state court trial judge entered findings of fact and conclusions of law in July 1995 recommending that a writ be denied. In December 1995, the Texas Court of Criminal Appeals found that the district court's findings of fact and conclusions of law were fully supported by the record and denied White a state writ of habeas corpus.

White then filed the instant federal petition in December 1995 and the district court denied relief on January 4, 1996. A few days later, this court granted a stay of execution pending our consideration of White's application for a certificate of probable cause.

In this court, White argues that the district court erred in rejecting three of the claims he presented to it for habeas relief. He first complains of the length of time (17 years) that he has been on death row. White argues that the State of Texas is responsible for this lengthy confinement and that his continuing incarceration and pending execution constitute cruel and unusual punishment in violation of the eighth amendment and international

6

law.    Second, White argues that the state court did not engage in independent fact finding during his habeas evidentiary hearing and this rendered the hearing fundamentally unfair.    Finally, White contends that he received ineffective assistance of counsel at trial in a number of respects.    He contends that his counsel: (1)failed to investigate his background; (3)failed to obtain a psychological evaluation despite severe symptoms of mental disorders; and (3)failed to raise a defense of automatism or to present evidence of White's mental disorders, for either culpability or mitigation purposes.    White asks this court to issue a certificate of probable cause and to reverse the district court's rejection of his habeas petition.

## II.

To qualify for a certificate of probable cause, White must make a "substantial showing of the denial of a federal right" Barefoot v. Estelle, 463 U.S. 880, 893 (1983).    This requires that White "demonstrate that the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further."    Id at 893 n. 4 (citations and quotations omitted).    We review White's application in light of this standard.

### A.

White argues first that the district court erred in rejecting his claim that he has been on death row for so long that to execute him now would be cruel and unusual punishment in violation of the

eighth amendment.

We considered this issue in Lackey v. Scott, 52 F.3d 98 (5th Cir. 1995). In Lackey, we vacated the district court's stay of execution and held that an identical claim was barred by the nonretroactivity doctrine of Teague v. Lane, 489 U.S. 288, 310 (1989)("new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced."). Lackey then sought a stay from the Supreme Court. The Supreme Court issued a per curiam order granting a stay of execution to allow the district court to hear Lackey's petition on the merits. White argues that the Supreme Court's order effectively vacated our decision in Lackey and that he now presents us with an issue of first impression. We disagree.

Our decision in Lackey remains the law of this circuit until reversed, vacated or remanded. The Supreme Court's reinstatement of the stay in Lackey did not pass on the merits of our decision and this panel cannot reject the controlling precedent of this circuit in favor of White's speculation on what the Supreme Court's action in Lackey could mean. A stay does not reverse, annul, undo or suspend what has already been done or what is not specifically stayed. Accordingly, we are bound to hold that Teague precludes relief on White's eighth amendment claim.[1]

However, even if this court was not bound to follow Lackey we

---

[1] In addition to our decision on Lackey's second habeas petition, discussed above, our decision on Lackey's first habeas petition also stands as precedent on this issue. See, Lackey v. Scott, 28 F.3d 486, 492 (5th Cir. 1994)(Teague bars claim in federal habeas petition that execution after lengthy imprisonment violates Constitution because punishment is grossly out of proportion with the crime committed). Accordingly

8

would agree with the district court that Teague applies. "[A] case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." Teague, 489 U.S. at 301. As a panel of this court noted in Fearance v. Scott, federal courts have encountered the claim that prolonged incarceration before execution is cruel and unusual punishment for decades. 56 F.3d 633 (5th Cir.) cert. denied 115 S.Ct. 2603 (1995). To date, no federal court has recognized such a theory of cruel and unusual punishment. Stafford v. Ward, 59 F.3d 1025, 1028 (10th Cir.) cert. denied 115 S.Ct. 2640(1995). See also, McKenzie v. Day, 57 F.3d 1461 (9th Cir.) opinion adopted, 57 F.3d 1493, 1494 (en banc), cert. denied, 115 S.Ct. 1840 (1995); Richmond v. Lewis, 948 F.2d 1473 (9th Cir. 1990). White's claim is not new in the sense that no one has ever attempted to argue it before. However, White can point to no precedent existing in 1990 when his conviction became final (and no precedent today) that would require the district court to grant him habeas relief if it finds that he has remained on death row for 17 years due to the fault of the state. Therefore, to grant White's petition would require us to announce a new and retroactive procedural rule declaring that prolonged incarceration prior to execution of the death sentence violates the eighth amendment. Teague forecloses such a holding. Teague, 489 U.S. at 310.

White argues that Teague should not bar his claim because a Lackey claim cannot ordinarily be raised on direct appeal due to the fact that much of the delay complained of arises in post-conviction proceedings. This is a valid criticism of Teague but it

9

does not alter the Supreme Court's holding. In fact, Justice Brennan dissented from the holding in <u>Teague</u> precisely because it would "deprive [the Court] of the manifold advantages of deciding important constitutional questions when they come to [the Court] first or most cleanly on collateral review." <u>Teague</u>, 489 U.S. at 345 (Brennan dissenting). Commentators note that, under the mandate of <u>Teague</u>, even issues which, as a practical matter, could <u>never</u> be raised on direct appeal are unreviewable in habeas proceedings. <u>See</u> James S. Liebman & Randy Hertz, <u>Federal Habeas Corpus Practice and Procedure</u>, § 25.4 at 749 (2d Ed. 1994). Even if we accept White's assertion that he could not have raised his <u>Lackey</u> claim on direct review, we must still find it barred by <u>Teague</u>.

White next argues that even if <u>Teague</u> bars his claims, he falls within its exceptions. Under <u>Teague</u>, courts can retroactively apply new rules to final convictions where the new rule will: (1) place certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe, or prohibit a certain category of punishment for a class of defendants because of their status or offense; or (2) require the observance of those procedures that are implicit in the concept of ordered liberty. Liebman & Hertz, <u>Federal Habeas Corpus Practice and Procedure</u>, § 25.1 at 717; <u>Teague</u>, 489 U.S. at 307; <u>Penry</u> 492 U.S. at 330.

White argues that he meets the first exception to <u>Teague</u> because the rule that he requests would make it unconstitutional to execute an entire class of defendants, those who due to no fault of

10

their own have been on death row for too long. See Penry v. Lynaugh, 492 U.S. 302, 330 (1989). However, our acceptance of White's argument would not place any primary conduct beyond prohibition and would not prohibit any category of punishment currently in use for specific offenses. See, Lackey, 52 F.3d at 100. White's argument also fails because his proposed "class" has no innate characteristic such as insanity or mental retardation which precludes imposition of the death penalty under the Constitution, See Id; Ford v. Wainwright, 477 U.S. 399, 401 (1986), and is not made up of individuals whose conduct was not eligible for punishment by death at the time of sentencing. See Coker v. Georgia, 433 U.S. 584 (1977) (petitioner convicted of rape not eligible for death penalty).

White also seeks to fall under Teague's second exception but does not advance any argument as to how granting his claim would require courts to follow "procedures implicit in the concept of ordered liberty." In fact, White's claim demands that capital punishment be carried out quickly in spite of the importance of thorough factfinding in capital cases and the state's compelling interest in ensuring that it does not execute innocent defendants. We agree with the State that White's proposed rule requiring speedy executions would not improve factfinding and is not implicit in the concept of ordered liberty. As a result, we find that White's eighth amendment claim does not fall under Teague's second exception to the nonretroactivity rule.

For all of these reasons we find that Teague bars White's eighth amendment claim. Lackey remains the law of this circuit and

11

we are bound to follow it. Further, it is undisputed that the rule that White asks us to announce and apply in his case has never before been embraced by a United States court. It is a new rule and cannot be applied retroactively under Teague unless it falls within one of two narrow exceptions, neither of which apply to White. As a result, the district court correctly concluded that White's eighth amendment claim was Teague barred.

B.

Even if this court were to consider White's eighth amendment claim on the merits, we would not grant him the relief he seeks. As the district court correctly noted, there are compelling justifications for the delay between conviction and the execution of a death sentence. The state's interest in deterrence and swift punishment must compete with its interest in insuring that those who are executed receive fair trials with constitutionally mandated safeguards. As a result, states allow prisoners such as White to challenge their convictions for years. White has benefitted from this careful and meticulous process and cannot now complain that the expensive and laborious process of habeas corpus appeals which exists to protect him has violated other of his rights. Throughout this process White has had the choice of seeking further review of his conviction and sentence or avoiding further delay of his execution by not petitioning for further review or by moving for expedited consideration of his habeas petition.

Even if much of the delay in this case is the fault of Texas, White cannot now complain of cruel and unusual punishment. White made no effort to inform the Texas courts that their delay was

detrimental to him or to ask for expedited review of his petition and we cannot fault them for assuming that White would be grateful for or, at least, indifferent to the delay. White cannot expect Texas courts to know that he wants to get on with his execution without telling them. A motion for expedited review is also necessary so that reviewing courts can distinguish between strategic behavior on the part of the prisoner who quietly waits with the hope of asserting a Lackey claim later and bona fide claims of malicious or intentional state delay. See Fearance v. Scott, 56 F.3d at 639. Further, White fails to allege that the delay in his case is due to anything other than court backlog and does not offer any evidence that Texas' delay in considering his petition was intentional or even negligent.

White relies on the decision of the United Kingdom's highest court for the proposition that "it is an inhuman act to keep a man facing the agony of execution over a long, extended period of time." Pratt & Morgan v. Attorney General of Jamaica, Privy Council Appeal No. 10 of 1993, slip op. at 16, reported at 3 W.L.R. 995, 143 N.L.J. 1639, 2 A.C. 1, 4 All E.R. 769 (British Privy Council Nov. 2, 1993)(*en banc*). In Pratt, the prisoners were read execution warrants several times in the face of repeated execution dates which were then stayed at the last minute. White, in contrast, prevailed on his first federal habeas challenge to his conviction and sentence and his first execution date was vacated. Following his second trial, White's second execution date was set less than 5 months ago and only after he had exhausted his remedies in state court. White also alleges no extraordinary facts or

13

unusual conditions beyond the inevitable anxiety of waiting for an execution date which cannot be avoided in a system of capital punishment.  See, Turner v. Jabe, 58 F.3d 924, 930 cert. denied 115 S.Ct. 2019 (1995).  As a result, we are not persuaded that White has been subject to cruel or unusual punishment.

No other circuit has found that inordinate delay in carrying out an execution violates the condemned prisoner's eighth amendment rights. See e.g., Stafford, 59 F.3d at 1028 (10th Cir.); McKenzie, 57 F.3d at 1494; Free v. Peters, 50 F.3d 1362 (7th Cir.) cert. denied, 115 S.Ct. 1397 (1995); Fearance, 56 F.3d at 639 (5th Cir.) These courts faced claims that were raised in successive petitions for a writ of habeas corpus while White makes his claim in his first federal habeas appeal from his second conviction.  As a result, White does not have to show cause in order to avoid dismissal as an abuse of writ.  Nevertheless, the reasoning of the courts which have considered Lackey claims demonstrates that even without the procedural bar, these courts would have found the claim meritless as we have.   See Stafford, 59 F.3d at 1028 (10th Cir.)("We conclude that Appellant has failed to show that executing him after fifteen years on death row, during which time he faced at least seven execution dates, would constitute cruel and unusual punishment"); McKenzie, 57 F.3d at 1494 (9th Cir.) ("We thus decline to recognize Richmond's lengthy incarceration on death row during the pendency of his appeals as substantively and independently violative of the Constitution"); Free v. Peters, 50 F.3d 1362 (7th Cir.) (rejecting claim that to execute petitioner after almost two decades of pursuing appeals and collateral relief

14

is cruel and unusual punishment) cert. denied, 115 S.Ct. 1397 (1995); Fearance, 56 F.3d at 639 (5th Cir.) (Fearance was not the unwilling victim of a Bleak House-like procedural system hopelessly bogged down; at every turn, he, without complaining about the accumulating period on death row, sought extensions of time, hearings, and reconsiderations.").

For these reasons, we conclude that White's eighth amendment claim would not entitle him to habeas corpus relief even if it were not barred by Teague v. Lane.[2]

III.

White next argues that his counsel was ineffective and that the state court's verbatim adoption of the government's proposed findings of fact and conclusions of law resulted in a fundamentally unfair hearing on his ineffective assistance of counsel claim. We affirm the district court's ruling on these issues on the basis of

---

[2]White also argues that "binding norms of international law" compel us to follow Pratt & Morgan and strike down his death sentence as a violation of his human rights. This argument is meritless. White argues that since his conviction became final, the United States has signed the International Covenant on Civil and Political Rights and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. Both of these treaties prohibit "torture or cruel, inhuman or degrading punishment or treatment." However, the United States Senate filed reservations with respect to both of these treaties which contend that the United States understands the language in these treaties to mean "cruel and unusual punishments" as defined by the eighth amendment. White's claims are barred by Teague for the same reasons his eighth amendment claims are barred. White's conviction was legal under international law when it became final in 1990. Further, even if we did consider the merits of this claim, we would do so under the Senate's reservation that the treaties only prohibit cruel and unusual punishment. As we have noted above, even on the merits, this argument would fail.

Judge Harmon's well-reasoned January 4, 1996 opinion.

## Conclusion

White's eighth amendment and international law claims of cruel and unusual punishment are barred by <u>Teague</u> and controlled by our decision in <u>Lackey</u>. On the merits, these claims would likewise fail because the delay that White complains of arises from post conviction proceedings which exist to protect White and which White, himself, requested when he petitioned for habeas relief.

White's claim that his evidentiary hearing was fundamentally unfair and his claim that his counsel was ineffective are also meritless and we decline to issue a certificate of probable cause on these issues for the reasons given by the district court.

For all of these reasons, we VACATE our stay of execution and DENY White's petition for a certificate of probable cause.