Filed 4/15/14  P. v. Novelo CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>EDWARD ALEXANDER NOVELO,<br><br>        Defendant and Appellant. | B242350<br><br>(Los Angeles County<br>Super. Ct. No. GA044263) |

        APPEAL from an order of the Superior Court of Los Angeles County, Suzette Clover, Judge.  Petition denied.

        Mark S. Givens, under appointment by the Court of Appeal, for Defendant and Appellant.

        Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

In 2001 appellant Edward Novelo was convicted by jury trial of multiple sex crimes. After the verdicts were received, but before sentencing, he moved for new trial on the ground of juror misconduct. His motion was based on a declaration stating that a juror discussed the case outside of deliberations, read about the case in newspaper articles, and prejudged Novelo's guilt. The motion was denied and the conviction was affirmed by this court. Novelo's petition for review was denied by the California Supreme Court. A series of habeas corpus petitions in both state and federal court followed. Eventually, the Ninth Circuit Court of Appeal granted habeas relief and ordered the state court to conduct a new evidentiary hearing on the juror misconduct issue. The trial court did so, at further proceedings at which 11 of the 12 former jurors, the original declarant, and an additional witness were examined.[1] The court found that the claim of misconduct was not substantiated and the evidence of juror misconduct was not credible. It denied the habeas petition.

Novelo appeals from that ruling.[2] He argues that the trial court erred by failing to conduct an adequate investigation of the misconduct claim when it was raised. He also argues that since the hearing was conducted 10 years later, it was not adequate because memories had faded and one juror had died. He contends that this constituted a violation of his federal right to due process and the state statutes governing claims of juror misconduct. Novelo contends he was prejudiced by the misconduct and is entitled to a new trial.

We find no due process violation, and that substantial evidence supports the trial court's finding that no credible evidence of juror misconduct was presented.

---

[1] Counsel reported that the 12th juror was deceased.

[2] An order denying a petition for writ of habeas corpus is not appealable. We may treat the appeal as a petition for writ of habeas corpus and reach the merits. (*People v. Garrett* (1998) 67 Cal.App.4th 1419, 1423.) We follow that course here.

## FACTUAL AND PROCEDURAL SUMMARY

We take some of our summary from our unpublished opinion affirming Novelo's conviction in *People v. Novelo* (Sept. 17, 2003, B158221) (*Novelo I*). On December 13, 2001, Novelo was convicted of two counts of forcible oral copulation, attempted sexual battery, forcible rape, sexual penetration by foreign object, and three counts of kidnapping with intent to commit rape in attacks involving six victims.

On April 12, 2002, after the jury had been discharged, Novelo filed a motion for new trial raising a number of issues. The only issue relevant to this proceeding is the claim of juror misconduct. No request for release of juror identifying information was made. The motion was based on the attached declaration of Jay Gardner. Gardner declared that he was in the courtroom on the morning of December 11, 2001 to watch closing arguments in Novelo's case. He said counsel and the judge discussed jury instructions and possible lesser charges outside the presence of the jury. A lunch recess was taken. Gardner declared: "When me and Carmen, defendant's fiancée[,] came[] back into the corridor where the elevators let you out, we started back to the courtroom. Carmen and her babies went to the restroom and I walked toward the courtroom. There was a lady sitting on a bench outside the first courtroom. . . . The courtroom where the Novelo case was being heard is the last Department down that corridor."

Gardner's declaration continued: "There was only one woman in the whole corridor. She was reading a newspaper. She folded it and set it next to her right side. She had no name tag or juror ID on. . . . We were the only two people in the entire corridor and as I walk toward the windows, in front of her, the woman said 'hello.'" Gardner responded by saying "'hello.'" The woman asked Gardner how he was doing that day, and he said he could be better. She asked "'Why is that[?]'" Gardner said it was because he was "'studying a case being heard here.'" He asked the woman why she was there, and she said she was doing jury duty. Gardner said: "'I can't do that having to put somebody away.'" The woman said: "'This case is easy. I saw it in the paper. It's an open and shut case.'"

3

According to Gardner, at that time, another juror came by and told the woman she should be wearing her juror badge. Gardner said: "I then immediately went into the courtroom to tell Mr. Novelo[*sic*] attorney what had occurred but he didn't want to hear anything and he said to me 'Whatever you have to say doesn't have any importance to me'. He then walked away from me." Gardner declared that "[d]uring that time, and immediately after Mr. Novelo's arrest, there were numerous articles in the newspaper concerning the Novelo case." He referred to an exhibit 1 to the motion, "reflecting said publicity," which is not in the record on appeal. Gardner declared that he "did not know or had heard of Mr. Novelo prior to his arrest" and was not related to him in any manner.

At the hearing on the motion in 2002, the trial court stated that it had just been provided articles about the Novelo case from the Pasadena Star News dated October 20, 2000, October 24, 2000, December 20, 2000, December 21, 2000, and one article after trial began, printed on December 12, 2001. After the verdicts were received there was an additional article on April 16, 2002.[3] Defense counsel stated that some of the articles, in particular the first, called Novelo a "serial rapist." The judge focused on the December 12, 2001 article, but did not take into account Gardner's statement that his conversation with the juror occurred the day before, on December 11, 2001. The court said the articles published before the start of trial "are certainly stronger and more prejudicial in the headlines, and in the text and quotations." In contrast, it found the December 12 article to be accurate and nonprejudicial.

Defense counsel stated that Gardner had identified the juror with whom he spoke as Juror No. 12. The court observed that Gardner's declaration was hearsay, but that it was inclined to accept it as Novelo's offer of proof.

The prosecutor argued against an evidentiary hearing, contending that any inquiry into the mental processes or state of mind of the jurors was prohibited by Evidence Code

---

[3] None of these articles is in the record on appeal. Defense counsel indicated there had been an article on December 14, 2001, the day after the verdicts were returned, which included a photograph of Novelo being led away in handcuffs. Since it was published after the alleged misconduct occurred, it is not relevant.

section 1150. He objected to Gardner's declaration on hearsay grounds. He also argued that the December 12, 2001 article was not prejudicial. The court concluded that the defense had not made a sufficient showing of prejudicial misconduct based on a juror's reading of the December 12, 2001 article, or her expression of an opinion about the case. The motion for new trial was denied. The court noted that it would have been helpful if trial counsel for Novelo had brought this to the court's attention, saying "I don't know how it would have affected the outcome, if at all. I could have made a better record." Novelo was sentenced to an aggregate term of 36 years to life in state prison.

Novelo exhausted his state court remedies by filing petitions for habeas corpus at the trial court, the Court of Appeal, and the California Supreme Court, all of which were denied. At that point, the United States District Court considered a petition for writ of habeas corpus filed in that court (*Novelo v. Yates, CV* 06-2544CJK(VBK)). The magistrate judge recommended that habeas relief be granted on the ground of juror misconduct because the California courts' adjudication of Novelo's claims was based on an unreasonable determination of the facts, in turn based on a record that established the juror could not have been reading the December 12, 2001 article, which was published after the alleged misconduct occurred. It found this error was compounded by the trial court's acceptance that the juror had read other articles about the case which it characterized as "'stronger and more prejudicial'" than the others.[4]

The District Court accepted the report and recommendation of the magistrate judge and granted habeas relief on the ground of juror misconduct. In so doing, the court raised issues concerning Gardner's credibility: "Although the Court accepts the Report and Recommendation, the Court does have reservations regarding the truth and accuracy of Mr. Gardner's declaration. Mr. Gardner was an interested party. Mr. Gardner

---

[4] The magistrate judge also found the Court of Appeal's conclusion that no impropriety was suggested by the juror's statement that the case was "'easy'" and "'open and shut'" was an unreasonable determination of facts in light of the record, because it was inextricably tied to the conclusion that the juror had read the impartial December 12 news article. According to the magistrate judge that statement suggested a real possibility of prejudice which required further development of the facts.

suggested that Juror Number 12 read newspaper articles regarding Mr. Novelo a year before the trial, and as a result harbored a bias against Mr. Novelo. Then, the juror apparently lied during jury selection about her exposure to these articles and misrepresented that she could serve as an unbiased juror. Finally, according to Mr. Gardner's declaration, the juror admitted her misconduct to a complete stranger in the hallway outside the courtroom just before closing arguments. The numerous credibility issues raised by Mr. Gardner's declaration should be addressed by the trial court [at] the due process hearing." A judgment granting relief was entered and stayed pending an appeal by respondent James A. Yates, warden at the Pleasant Valley State Prison.

The Ninth Circuit affirmed on the grounds stated by the district court. It held that Novelo was denied the opportunity to investigate the juror's actual bias because he was unable to question her about her statement and thus could not show which prejudicial newspaper articles, if any, she had read. It stated: "As the district court found, the Gardner declaration suggested that Juror Number 12 read the newspaper articles the state trial court did find prejudicial; harbored a bias against Novelo as a result; lied during jury voir dire; and admitted this misconduct to Gardner." The court acknowledged "there are reasons Gardner may not be credible" but concluded his credibility could be assessed only after a hearing in which all facts are developed, and concluded that Novelo's evidence of juror bias was sufficient to warrant the hearing. The case was remanded to the California trial court for a hearing on the misconduct claim.

Initially, the trial court's efforts to comply with the Ninth Circuit opinion were thwarted because Gardner could not be located. The court initiated the process for disclosing juror identifying information under Code of Civil Procedure section 237, sending letters to the 12 jurors informing them of the request for their identifying information and setting a hearing on the matter.

On January 17, 2012, Juror Nos. 8, 9 and 12 appeared in court in response to the court's letter. Contrary to the statements by counsel for Novelo identifying Juror No. 12 as the female juror who spoke with Gardner, Juror No. 12 was male, not female. After discussion with these jurors, counsel for both sides stipulated that each had no

6

information and did not recall anything relevant to the misconduct issue raised in the Gardner declaration.  The matter was continued to February 2, 2012 for hearing on the misconduct motion.  At that hearing, the prosecutor informed the court that Gardner had been located; he was an inmate at the state prison in Chino.  The court granted the motion for disclosure as to the nine jurors who had not responded to the court's letter.  The court and counsel agreed the jurors would be subpoenaed to appear at the misconduct hearing.

Eight of the nine remaining jurors appeared for the hearing on March 2, 2012.  They were examined under oath.  Counsel informed the court that one juror, Tracy Graham, was deceased, but did not explain the basis for this statement or when the juror had died.  The original jury was composed of six men and six women.  Through a process of elimination, the record reflects that the deceased juror was female.  Five jurors recognized Novelo as the defendant in the case on which they served as jurors.  Two did not recognize him, but recognized his name in connection with their jury service.  One said he recalled being a juror in this case in the same courtroom 10 years before, but only "sort of" recognized Novelo as the defendant in that case.  He did not really recall the name "Novelo."  That juror had been a juror on only one trial in that courthouse, about 10 years before.

None of these jurors recalled a juror mentioning anything about having read about the case in a newspaper at any time during the trial, whether in deliberations or during a recess.[5]  Seven of them did not recall any juror expressing an opinion as to Novelo's guilt or innocence before deliberations started, or basing the verdict on anything other than the evidence presented at trial.  The eighth juror was not asked this question.  Only one female juror was asked whether her verdict was based on anything other than the evidence.  She said it was not.

Two of the jurors, both women, were asked whether they recalled a juror whose appearance matched the description given by Gardner in his declaration.  Each said they

---

[5] When one juror said he did not recall any juror saying he or she had read about the case in the newspaper, he was asked whether it was possible that it happened and that he did not recall because 10 years had passed.  He responded "I suppose it's possible."

7

did not. The other six jurors were not asked this question. Three of the female jurors said they never discussed the case with a stranger. Two female jurors and the male jurors were not asked this question. One female juror was directly asked whether she personally had read any newspaper accounts about the case during the trial. She said she had not. Another female juror testified that she did not know anything about the case other than what she heard in the courtroom. She did not remember anything about the case appearing in the newspaper during trial. The other jurors were not asked about their personal knowledge of press coverage.

Two female jurors were asked about their physical appearance as it related to time of trial. One said her hair was a little grayer than at time of trial but that her body type was the same. The other said her hair was two inches longer during the trial. No record was made as to whether any of the female jurors matched Gardner's description of the juror with whom he spoke.

Gardner was transported from prison to testify at the hearing. The court had prohibited defense counsel from preparing Gardner for his testimony by reviewing the declaration filed in support of the motion for new trial, in order to "have Mr. Gardener's [*sic*] testimony as of what he remembers about the event . . . and whether or not it contributed to his declaration." Gardner was serving time in prison on a conviction for oral copulation. He acknowledged that he knew Novelo at Berkeley and that they first met in county jail in 2001. He believed they had been in jail together for about three days. Novelo discussed his case with Gardner, who described himself as "kind of a legal beagle" saying that he likes the law and follows it. Since he had been released from jail, Gardner decided to watch Novelo's trial because of his interest in crime and punishment.

Gardner was asked whether he had a conversation in the hallway outside the courtroom with "someone [he] believed to be a juror." He said: "Someone I knew was a juror." Gardner explained: "I seen her sitting in the jury panel prior to the break. And then I saw her out in the hallway in the break talking to another person that wasn't a juror in the panel. I don't know who the lady was she was talking to. We were kind of having a little social discussion. She started discussing the case. And she pulled out a

8

newspaper that she had and started to discuss the case. And she had . . . saved a folded-up piece of newspaper that had his case in the newspaper." Gardner explained that it was a portion of a newspaper, folded over. It had an article about Novelo's case. Gardner did not have an opportunity to read the article, but the juror said she had been reading it. The court overruled a hearsay objection to Gardner's testimony about the juror's statements.

According to Gardner, the juror had the article sitting next to her folded between the straps of a shoulder bag. She had been reading it when "we" walked up. She put it down, then picked it back up and said something to the effect that "she knew this guy was guilty, and she didn't need to hear any more testimony, and she already made up her mind. She said she'd been following the story in the news prior."

After this, Gardner met Maria Carmen Alvarez, Novelo's girlfriend, in the hallway. He told her "'This lady is discussing the case out in the hallway with other jurors.' The other lady was another juror but was not seated on this panel. She was seated on another case and was out on a break in the hallway." Alvarez said that they should tell the judge. Gardner testified that he came into the courtroom and told the judge what happened in open court. Then he said he could not recall whether he spoke directly to the judge, or whether he told the attorney, who then told the judge. He said: "[W]e discussed the fact there was a juror outside who had a newspaper clipping and was discussing the trial, and it wasn't over yet, and she'd already made up her mind." Gardner remembered standing in the audience section of the courtroom, and was not sure whether he spoke to the judge. He did not recall whether Novelo's attorney addressed the judge while he was present. He did not recall signing a declaration about the incident. Gardner was asked whether he remembered Novelo's attorney saying that he did not want to hear anything and saying "'whatever you have to say doesn't have any importance to me'" before walking away. He responded: "Now that you say that, it probably did happen. I think I talked to the judge personally." He explained: "I must have because I had to have somebody acknowledge the fact that it happened. I have nothing against her or was trying to get her off the jury for any reasons. I felt what she was doing was inappropriate and she should be replaced by an alternate."

9

When asked what the judge said to him, Gardner said "I mentioned that the lawyer had a bit of disdain for my comments and didn't want to get involved with it. But I must have because I didn't leave the court without telling somebody." He could not recall what the judge said, but said he was not very receptive. Gardner said he thought this was not appropriate based on his understanding that jurors should "sequester themselves about the case" and not talk "about what they're doing in the jury box outside or any other place with anybody else."

Gardner did not maintain contact with Novelo after the case was over. He said he met Alvarez during the trial; he had not known her before. He talked with her once or twice after the trial to check on the baby. The last time was nine or nine and one-half years earlier. He did not know why he was brought to court, and felt blindsided and upset about being transported to the court for the hearing. Then he said: "I came anyway because it's the right thing to do."

Gardner was asked whether he recognized any of the people who had been in the courtroom for the hearing as the juror with whom he had the conversation. He said it could have been one of the ladies. He said the lady he spoke to had gray hair. He explained: "So one of the two ladies. I thought it was over here. I'm not sure. It's been ten years and people change. And I spoke to her for a matter of moments." Gardner said: "I thought I recognized the lady over here." The trial court inquired as to the identity of the person identified by Gardner. Defense counsel said: "It was not one of the jurors. It was a smaller-in-stature, white female with gray hair." The prosecutor agreed. Gardner's belief that the juror with whom he spoke was one of two women was based on hair color. He just remembered the lady had gray hair.

Novelo's girlfriend, Alvarez, also testified at the hearing. By the time of trial, she had given birth to Novelo's child. She said she met Gardner in court at the trial. On cross-examination, Alvarez was asked if she knew Gardner before Novelo's trial. She testified: "I believe one time he went to Mr. Novelo's mom's house and that's where I met him as well." She explained that Gardner was trying to help Novelo and Alvarez "find stuff or attorneys" because it was their first time with anything legal. Gardner did

10

not tell Alvarez before trial that he was going to attend. She did not come to trial with Gardner. During breaks in the trial, Gardner would play with Alvarez's daughter.

At one point during trial, she saw Gardner in the hallway conversing with a juror. Alvarez believed the woman was a juror because she later saw her sitting in the jury box at trial. The woman was reading a newspaper. She could not hear their conversation. Later that afternoon, Gardner told her that the woman was a juror who said that "whatever witnesses Mr. Novelo had or whatever testimony or whatever he had, the jury had already decided that he was guilty." According to Alvarez, this occurred earlier than the timeframe provided by Gardner, before the defense had presented any witnesses. Alvarez told Gardner to tell Novelo's attorney. She said: "I don't know if he did. Like I said, I was with my daughter outside so I didn't bring her into the courtroom."

After considering briefing submitted by the parties, the court found that nothing Gardner alleged was substantiated by the jurors. The court said: "I just don't think the defense witness's scenarios make sense." Counsel for Novelo conceded that neither Gardner nor Alvarez was a disinterested party, but downplayed their relationship. He said he was not claiming that the juror at issue had repeated her belief about Novelo's guilt in the jury room. The prosecutor argued the evidence at the hearing did not substantiate Gardner's claim of misconduct. He contended that Gardner's testimony was not credible in light of his relationship with Novelo and Alvarez.

The court rejected the claim of prejudice based on the passage of time: "[W]ith the exception of the juror who passed away—every single juror in whatever state of health and from whatever location in the country was brought in here, testified that they didn't know anything about this. And certainly a juror bringing up something like that completely against all their instructions would have been something the jurors would have remembered. So I just don't think that your argument, with respect to the passage of time, works in that case." The trial court did not credit the scenario described by Gardner and Alvarez , and pointed out that there was no evidence corroborating it. The petition was denied. As we have stated, we treat Novelo's appeal as a petition for writ of habeas corpus.

11

## DISCUSSION

### I

"A defendant accused of a crime has a constitutional right to a trial by unbiased, impartial jurors. [Citations.] A defendant is 'entitled to be tried by 12, not 11, impartial and unprejudiced jurors. "Because a defendant charged with a crime has a right to the unanimous verdict of 12 impartial jurors [citation], it is settled that a conviction cannot stand if even a single juror has been improperly influenced." [Citations.]' (*People v. Holloway* (1990) 50 Cal.3d 1098, 1112, disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)" (*People v. Nesler* (1997) 16 Cal.4th 561, 578.) The jury's verdict must be based only on the evidence presented at trial in order to satisfy the defendant's due process rights. (*In re Boyette* (2013) 56 Cal.4th 866, 890.)

"The trial court is vested with broad discretion to act upon a motion for new trial. [Citation.] When the motion is based upon juror misconduct, the reviewing court should accept the trial court's factual findings and credibility determinations if they are supported by substantial evidence, but must exercise its independent judgment to determine whether any misconduct was prejudicial. [Citations.] A juror's receipt or discussion of evidence not submitted at trial constitutes misconduct. [Citation.] Juror misconduct raises a rebuttable presumption of prejudice; a trial court presented with competent evidence of juror misconduct must consider whether the evidence suggests a substantial likelihood that one or more jurors were biased by the misconduct. [Citation.]" (*People v. Dykes* (2009) 46 Cal.4th 731, 809.)

### II

Novelo argues the 10-year delay in holding a hearing on his claim of juror misconduct violated his federal constitutional right to due process and California law on the discharge of jurors. He contends that the trial court erred in failing to hold a hearing in 2001 and 2002, when the claim was first raised. He asserts the 2012 hearing was insufficient since memories had faded in the ensuing 10 years, one juror had died, and Gardner was unable to identify the juror with whom he spoke. In addition, he contends

that both Gardner and Alvarez could have provided more detail to support the misconduct claim had they testified in 2001 or 2002.

The Ninth Circuit has determined that the trial court erred by failing to conduct a hearing on the misconduct claim when it was presented in April 2002. Based on that, the issue before us is whether Novelo's due process rights were violated because the hearing was not held until 10 years after the misconduct claim arose.

A. *Trial Court Not Alerted During Trial*

Novelo contends that the trial court's duty to hold a hearing first arose in December 2001 when the misconduct was first brought to its attention. We find no factual basis for the assertion that the trial court was alerted to the problem in 2001. In the motion for new trial heard in April 2002, counsel for Novelo stated: "In this matter the court never had a chance to conduct an inquiry as to possible jury bias/misconduct because the court was never aware of any such misconduct since the defense attorney failed to take any affirmative action on this issue." At the hearing on the motion in April 2002, defense counsel observed that the court was unable to "take any action, because it was not aware" before the verdicts were returned.

Our conclusion that the claim of misconduct was not brought to the attention of the trial court in December 2001 also is supported by minute orders and reporter's transcripts of the trial.[6] They establish, as the Ninth Circuit determined, that the trial session described by Gardner in his declaration as occurring on December 11, actually occurred on December 10. That is because Gardner described a discussion about jury instructions and lesser included offenses; these occurred on December 10. On December 11, the jury heard closing arguments. Neither the reporter's transcript, nor the minute orders, indicate that a claim of juror misconduct was brought to the court's attention. It is reasonable to conclude, as the trial court apparently did conclude, that if such a significant event had occurred off the record, the court would have made a record of the

---

[6] We have taken judicial notice of the record of the trial, from the record on appeal in case number B158221. (Evid. Code, §§ 452, subd. (d), 459.)

13

occurrence. Thus, it was not credibly shown that the claim of juror misconduct was brought to the court's attention before the jury was excused. This disposes of Novelo's alternative argument that the failure to accord him a hearing on the misconduct claim violated Penal Code section 1089 which gives the trial court discretion to discharge a juror for good cause with respect to the jury deliberations. No good cause was shown during deliberations.

## B. Judicial Process

Novelo claims that the 10-year period in which he sought relief through direct appeal and petitions for habeas corpus made it impossible for the trial court to conduct an adequate hearing when ordered to do so by the Ninth Circuit, resulting in a violation of his right to due process. In *People v. McDowell* (2012) 54 Cal.4th 395 (*McDowell*), the Supreme Court rejected an argument that a 15-year delay between conviction and a second penalty phase retrial constituted cruel and unusual punishment and a violation of the right to speedy trial and due process. As to the due process claim, the Supreme Court stated that the "*defendant* availed himself of the judicial process to challenge his conviction and sentence by appeal and collateral review." (*Id.* at p. 415.) The *McDowell* court cited with approval *White v. Johnson* (5th Cir. 1996) 79 F.3d 432, noting that the case arose in the context of a cruel and unusual punishment claim. But the Supreme Court held that the "reasoning applies in the context of defendant's speedy trial and due process claims as well. Here, where defendant has benefitted from the careful and meticulous process of judicial review, he cannot now complain that the process 'which exists to protect him has violated other of his rights.' (*Id.* at p. 439.)" (*McDowell*, at p. 415.)

That reasoning applies to this case. Here Novelo benefited from the judicial review which culminated in the Ninth Circuit order requiring the trial court to hold an evidentiary hearing on his claim of misconduct. No due process violation occurred. In any event, as we next discuss, we conclude that Novelo failed to demonstrate that he was prejudiced by the delay.

14

C. *Novelo's Claims of Prejudice*

Novelo argues that because of the delay, he was unable to identify a third party witness to the misconduct. He contends that the death of a female juror was particularly prejudicial. He asserts that there is a "significant possibility" that this juror was the woman who committed misconduct because none of the other 11 jurors recalled anything about the misconduct, and the trial court found them credible. He claims his inability to question the deceased juror was prejudicial because either she was the misbehaving juror, or if not, she might have had information to identify that juror. He also claims that Gardner and Alvarez would have been able to provide additional details if the hearing had been held promptly.

As we shall explain, Novelo fails to demonstrate a violation of his due process rights. We reject the argument based on the third party witness because the presence of a third party was raised only after the delay occurred. Substantial evidence supports the trial court's conclusion that Gardner's claim is not credible. Novelo failed to make adequate inquiry at the hearing to establish that any female juror fit the description given by Gardner. In general, the examination of the jurors was not adequate to support Novelo's claims that he was prejudiced by the impact of the delay on the jurors' ability to recall. The testimony of the jurors at the hearing did not establish that their deliberations were tainted by outside information or bias. Nor did the jurors corroborate Gardner's misconduct claim. We address each of these issues in turn.

*1. Third Party Witness*

Novelo asserts that if the evidentiary hearing had been held in 2002, "Mr. Gardner likewise would have been able to identify the third person with whom the offending juror was discussing the newspaper article about this 'open and shut case' in the hallway outside of the courtroom. This third person would have been able to provide further corroboration that appellant's juror had a newspaper article about the case with her, that the juror said that she had been following the case in the news, and that the juror said that she already had made up her mind that appellant was guilty without needing to hear any more evidence." But in 2002, the court had only Gardner's declaration before it, which

15

stated that he and the offending juror "were the only two people in the entire corridor . . . ." According to the declaration, another juror arrived only after the juror had already made the allegedly improper comments. Gardner declared that he immediately left to report the incident. The presence of a third party was claimed only in his testimony 10 years later. Based on this record, the trial court and counsel would have had no reason to attempt to find a third party in 2002, and therefore the 10-year delay was not prejudicial on this ground.

### 2. *Identification of the Juror*

Gardner did not describe the female juror in his declaration. At the hearing, Gardner identified a bystander as the juror with whom he spoke, rather than any of the five female jurors who testified that day. He was not sure about his identification, saying "I'm not sure. It's been ten years and people change. And I spoke to her for a matter of moments." He said he just remembered that the juror had gray hair.

The record does not establish that any of the women on the jury matched Gardner's vague description. The inquiry at the hearing in this regard was insufficient to provide an adequate record on this issue. Only two of the female jurors were asked any questions about their appearance. Ms. D.B. said her hair was grayer at the time of hearing, but her body type was the same, although it was not described. Juror L.C. said her hair was two inches longer at time of trial, but was not asked how long it was at the hearing, or its color either at trial or at the hearing. Three jurors, Ms. M.A., Ms. G.B. and Mr. P.W., were asked if they recalled a white female juror with long dark hair, a description given by defense counsel rather than Gardner[7]. They did not. The others were not asked. Counsel for Novelo did not introduce a photograph or other description of the deceased juror in order to examine the witnesses at the hearing as to whether she matched the description given by Gardner. No evidence of the date of her death was presented.

---

[7] The jurors testified before Gardner at the misconduct hearing.

Under these circumstances, Novelo has failed to demonstrate that the juror was not identified because of the delay.

### 3. *Deliberations Were Not Tainted*

Novelo claims that none of the 11 jurors recalled whether any other juror possessed newspaper articles about the case during trial or revealed they had read such articles or whether any juror expressed any bias prior to deliberations. The way the questions to the jurors were framed by defense counsel at the hearing created ambiguity in their answers. Some jurors were asked: "Do you recall any of the jurors having expressed an opinion whether the defendant was guilty or not guilty before deliberations started?" Juror G.B. said "No." Juror L.C., J.F. and P.W. also were asked whether they recalled any juror expressing an opinion about the case based on anything other than the evidence, and said they did not.[8]

Juror J.I. was affirmatively asked whether any juror expressed an opinion about Novelo's guilt or innocence based on anything other than the evidence. He said "No." Juror M.A. was asked affirmatively: "During the course of the trial, either while you were deliberating or while you were just waiting for court out in the hallway or walking to your car, was there ever an occasion where you had a conversation with one of the other jurors about that juror having read about the case in the newspaper?" She answered: "No." Juror L.C. also was asked an affirmative question, whether she had a conversation with any juror that raised the suspicion that the juror had read anything about the case in the newspaper. She said she had not.

We agree with the trial court that none of the jurors corroborated the claim of juror misconduct in any way.

_____

[8] Juror P.W. was asked: "During the course of your service as a juror ten years ago, do you recall either having a conversation with or overhearing any conversation in which any of your fellow jurors discussed having read about the case in the newspaper?" He responded: "I don't recall anything like that." He was the only juror asked this follow-up question: "When you say you don't recall, is it possible that it happened and you don't remember because it's ten years?" P.W. answered: "I suppose it's possible."

17

### 4. *Gardner's Credibility*

Gardner had a criminal history and was serving time in prison in 2012. He downplayed his relationship with Novelo. In his original declaration, he said he did not know Novelo prior to his arrest. If this was a reference to Novelo's arrest on the present sexual offense charges, it is inconsistent with Gardner's 2012 testimony that he knew Novelo during a prior incarceration in jail[9]. His declaration did not mention that he came to watch Novelo's trial because of his interest in the case; that he had tried to provide Novelo and his family with legal assistance on the case; and that he had been to the home of Novelo's mother, as the testimony at the hearing established. This also contradicted Gardner's testimony that he did not know Alvarez before the trial. According to Alvarez, Gardner played with her daughter during breaks in the trial.

In addition, Gardner had an unusual interest in criminal law, describing himself as a "'legal beagle,'" and saying that he likes the law and follows it. He explained that Novelo "discussed his case with me, and I got familiar with it. I was out when his trial was going on, so I wanted to check it out." He also testified that he "happened to have some interest in crime and punishment. I wrote on crime and punishment on Netcom. It is like a Twitter precursor." He also said "I kind of am a news junky about crime and punishment. I know jurors are not supposed to read about the case or discuss it with other people, and she did all the above out in the hallway." This evidence was sufficient to raise an inference that Gardner was biased in favor of Novelo.

There were multiple inconsistencies between Gardner's 2002 declaration and his testimony in 2012. In his declaration, Gardner implied that he did not know the woman with whom he was talking was a juror until she told him that she was doing jury duty. At the hearing, Gardner testified that he knew the woman to be a juror because he had seen her sitting in the jury panel before the break, an apparent reference to the trial session

---

[9] When asked at the 2012 hearing if he knew Novelo, Gardner said "Yeah, at Berkeley." He was then asked when they first met, and Gardner answered "In county jail" in 2001. He was not asked to clarify whether the two men met in Berkeley first, or in a county jail.

18

immediately before the break during which the claimed misconduct occurred. But the jury was not present during that session, which was devoted to a discussion of jury instructions and lesser included offenses between the court and counsel.

Gardner also was inconsistent about whether he was alone with the juror when the alleged misconduct occurred. In his declaration, he said that he and the juror "were the only two people in the entire corridor." According to the declaration, it was only after the juror said she had read about the case, that it was "easy," and "'open and shut'" that another juror approached. But in his testimony, Gardner said he saw the woman, whom he knew to be a juror, "out in the hallway in the break talking to another person that wasn't a juror in the panel. I don't know who the lady was she was talking to. We were kind of having a little social discussion. She started discussing the case. And she pulled out a newspaper that she had and started to discuss the case."

Gardner was inconsistent about how he reported the misconduct. In his declaration he said he informed defense counsel, who disregarded the report. At the hearing, at first he was unsure whether he told defense counsel or spoke directly with the trial court. As he testified, he became more certain that he had reported the misconduct to the judge in open court. The trial record does not reflect any such report of misconduct.

Based on Gardner's criminal record, bias in favor of Novelo, and the inconsistencies in his testimony, we agree with the trial court that no juror misconduct occurred.

More fundamentally, the alleged comment made by the juror did not establish that she refused to participate in deliberations based on her opinion about Novelo's guilt. Even if Gardner's account was credited, it does not establish a violation of due process. "A juror who holds a preliminary view that a party's case is weak does not violate the court's instructions so long as his or her mind remains open to a fair consideration of the evidence, instructions, and shared opinions expressed during deliberations." (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 73.) The *Allen* court acknowledged that "section 1122 requires jurors not to form an opinion about the case until it has been

19

submitted to them" but concluded "'it would be entirely unrealistic to expect jurors not to think about the case during the trial. . . .' [Citation.]" (*Ibid.*) Here there is no evidence that the juror with whom Gardener said he spoke failed to consider the evidence, instructions, and opinions of other jurors during deliberations. The 11 jurors were not asked whether there was any juror who refused to deliberate. Six of the eight jurors who testified at the hearing said that they did not recall any juror expressing an opinion about Novelo's guilt before deliberations started, the other two were not asked.

On this record, we find no juror misconduct and no violation of Novelo's due process rights.

## DISPOSITION

The appeal, treated as a petition for writ of habeas corpus, is denied.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EPSTEIN, P. J.

We concur:


WILLHITE, J.


MANELLA, J.

20